2021 IL App (1st) 182085
No. 1-18-2085
Opinion filed March 22, 2021

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 06 CR 24305 (02) |
| | ) | |
| ANTHONY GAVIN, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Paula M. Daleo, |
| | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Walker and Justice Pierce concurred in the judgment and opinion.

**OPINION**

¶ 1    After a bench trial, the court found Anthony Gavin guilty of first degree murder for the

shooting death of Eugene Winters. The court allowed Gavin to represent himself for proceedings

on his motion for a new trial, which the trial court denied. Counsel represented Gavin during his

first sentencing hearing, and the court sentenced him to 50 years in prison. This court reversed the

trial court's judgment and remanded for new posttrial proceedings, finding the trial court gave

insufficient admonishments before allowing Gavin to proceed *pro se*. *People v. Gavin*, 2015 IL

App (1st) 130701-U, ¶ 52.

¶ 2      On remand, Gavin filed a *pro se* motion for a new trial (which later-appointed counsel adopted). In part, Gavin argued that trial counsel was ineffective for (i) failing to cross-examine and (ii) then failing to call in her case-in-chief a witness who would explain that he could not identify the shooter and an officer who would corroborate that testimony. After hearing from both witnesses and Gavin's trial counsel, the court denied his motion for a new trial. Gavin was sentenced to 33 years in prison.

¶ 3      Gavin now repeats his arguments about trial counsel's ineffectiveness. He also argues his 33-year sentence, when considered with consecutive sentences in unrelated cases, is an unconstitutional *de facto* life sentence because he was 17 at the time of the offense. Alternatively, he argues his sentence is excessive. We disagree with each of his contentions and affirm the trial court's judgment.

¶ 4                                  Background

¶ 5      We set out the basic narrative of Gavin's offense in our order in his first appeal. See *id.* ¶¶ 4-23. We repeat in detail only the testimony relevant to our analysis.

¶ 6      Melvin Holmes testified that he lived in the 1600 block of South Third Avenue in Maywood. On September 20, 2006, around noon, he was outside having a cigarette. As soon as Holmes closed the door to go back inside, he heard gunshots. He "peeked out the front porch window" and saw somebody shooting Winters. Holmes identified the shooter as a black male. The shooter then got into the back seat of blue Mercury, and the car drove away.

¶ 7      Holmes went outside to talk to Winters and let him know the police were on the way. As Holmes talked to Winters, the blue Mercury drove back up the block. The same man who Holmes identified as the shooter got out of the car and came towards Holmes and Winters. Holmes "started

slowly backing away" up the steps of his house. Winters had taken out a phone, and Holmes watched as the shooter said, "who the f\*\*\*you talking to?" and shot Winters in the face. Holmes had backed all the way into his house and did not see where the shooter then went.

¶ 8    The next day, Holmes went to the police station to look at a photo lineup. After being advised about lineup procedures, Holmes identified the driver out a series of five polaroid photographs. The State did not ask him any questions about identifying Gavin, either in a lineup or in court. Maywood Police officer Jeremy Pezdek later confirmed that Holmes identified the driver.

¶ 9    On cross-examination, Gavin's counsel focused primarily on his ability to see the driver, the shooter, and the weapon. She did not ask him any questions about his participation in the photo lineup or ask him whether he identified Gavin as the shooter. Counsel for Gavin's co-defendant, Harvey Bowen, elicited affirmative testimony from Holmes on cross-examination that Bowen was not the shooter.

¶ 10    At the scene during the shooting were two other witnesses, Cortez Henderson and Denzel Edwards. They each gave statements to police or prosecutors. In Edwards's statement, he said that he rode to the scene with Gavin and Bowen. After getting out of the car, Bowen started arguing with Winters. Edwards got out of the car then, and Winters told him to walk away. As Winters did so, Edwards heard one gunshot. He turned and saw Gavin and Bowen standing over Winters. Gavin and Bowen had guns in their hands, a 9-millimeter and a .32 or .22-caliber, respectively. Edwards started running and heard four or five more shots. He saw Bowen's car drive away, come back up the block, and then heard two or three more gunshots. According to Edwards's statement, all the shots sounded like they came from the same gun.

¶ 11    At trial, Edwards repeatedly testified that he did not recall providing his statement's details to Assistant State's Attorney Maureen O'Brien. In Gavin's first appeal, we noted that Edwards's inability to remember what he told O'Brien did not "directly contradict[ ]" most of his written statement. *Id.* ¶ 34. O'Brien also testified that Edwards gave the statement as it was written.

¶ 12    Henderson's statement does not appear to be in the record. Pezdek testified that he spoke to Henderson at the Maywood Police Department the afternoon of the shooting. According to Pezdek, Henderson told him he was in the 1400 block of South Third Avenue on September 20, 2006, when he heard five or six gunshots. He walked to the intersection of Third Avenue and Van Buren Street, where he saw Winters on the ground. Henderson saw Bowen drive past Winters and saw Gavin run up to Winters and shoot him several times. Gavin then got back into Bowen's car, which drove off. In Gavin's first appeal, we considered Henderson's identification to be substantive evidence. *Id.* During his testimony, however, Henderson repeatedly said he did not recall giving a statement to Pezdek.

¶ 13    Five of the six bullets in Winters's body were from a .32-caliber firearm. Samples from the left and right rear seats in Bowen's car came into contact with an item that had released gunshot residue or were in the environment of a fired gun. Officers eventually recovered a 9-millimeter handgun and found a fingerprint on it but could not make an identification. Overall, no physical evidence directly linked Gavin or Bowen to the shooting.

¶ 14    The trial court found Gavin guilty of first degree murder. The court denied Gavin's motion for a new trial after allowing him to litigate it himself and sentenced him to 50 years in prison. On direct appeal, this court reversed, finding the court gave Gavin insufficient admonishments before allowing him to represent himself. *Id.* ¶ 52. We remanded for new posttrial proceedings. *Id.*

¶ 15                      New Posttrial Proceedings

¶ 16    At the hearing for a new trial, Holmes testified that someone got shot in front of his parents' house about noon on September 20, 2006. Holmes looked out the window and saw a black man outside. The man got in a car and "took off." Holmes could not see the driver. After the car drove away, Holmes went outside and talked to the victim when the car came back. Someone got out of the car and started walking toward Holmes and the victim. Holmes got only "a glimpse" of the driver.

¶ 17    As to the shooter, Holmes denied identifying him to the Maywood police, denied seeing him at the 2011 trial, and denied seeing him in court the day of the motion hearing. Holmes could not remember being interviewed by defense counsel or defense investigators before his 2011 testimony. When asked whether defense counsel had inquired as to the presence of the shooter in court, Holmes responded: "No, not that I remember." Holmes also said defense counsel did not ask him whether Gavin was the shooter. When counsel pointed Gavin out at the motion hearing, Holmes said he was not the shooter. Holmes explained he described the shooter to police in 2006 as a "tall, slanky [sic] type of guy with dark skin," though he admitted he did not see the shooter "clearly" because "everything happened so fast."

¶ 18    Pezdek also testified at the motion hearing. Pezdek said Holmes did not identify Gavin as the shooter in showup identification conducted on September 21, 2006. Pezdek could not recall whether Gavin's counsel asked him about Holmes's non-identification at trial or interviewed him before trial. After reviewing the trial transcripts to refresh his recollection, Pezdek agreed that Gavin's counsel did not cross-examine him about Holmes at all. He also agreed that Gavin's counsel did not ask him about Holmes when he testified in the defense case-in-chief.

¶ 19 Denise Streff, Gavin's trial counsel, was the final witness. Streff identified an investigation request form asking her investigator to find and interview Holmes. Notes from Streff's file, dated July 21, 2010, and May 4, 2011, did not show one way or the other if she or the investigator interviewed Holmes. Streff recalled interviewing Holmes, however, and, in response to questions from the court, she said she might not have taken notes because Holmes "was saying what he said to the police," consistent with the police reports. Holmes had identified the shooter as an "African-American man." As to Pezdek, Streff explained she "probably" did not interview him.

¶ 20 Motion counsel also asked Streff about her cross-examination of Holmes and Pezdek. Streff agreed that she did not ask Holmes whether he saw Gavin at the scene. When asked to explain why she did not question Holmes in this way, Streff said, "There's always a chance that [Holmes] said, oh, do you know what, that is the guy I saw do it. So that would be, I think not good trial practice on my part to do that." She also agreed she never asked Pezdek whether Holmes identified Gavin as the shooter.

¶ 21 After hearing arguments from the parties, the court rejected Gavin's claim of ineffective assistance of counsel. In its factual findings, the court concluded that Holmes did not give a "negative identification," meaning an identification of someone else as the shooter; instead, Holmes gave a "non-identification," meaning he could not identify anyone. The court found that Streff "explained fully why she did not take the chance *** of [Holmes] making an in-court identification as the shooter," concluding that her actions were not unsound strategy. The court also concluded that Gavin's identification as the shooter "did not rest on what Holmes said but on the identification by other witnesses." In light of its conclusions about Gavin's ineffectiveness claim (as well as the other claims in his motion), the court denied the motion for a new trial.

¶ 22    Gavin's motion counsel immediately asked for reconsideration. After argument, the trial court clarified its findings: "And that's really the crux of it. [Holmes] stated that he did not see the shooter. He did not describe or identify [Gavin] as being the shooter. He just basically said, I did not see the shooter. I saw the driver." With that clarification, the court affirmed its denial of the motion for a new trial.

¶ 23    At sentencing, the State called three witnesses in aggravation. Anthony Trevino, a Cook County Corrections officer, testified that on October 2, 2007, he got into a fight with an inmate after the inmate refused to return to his cell. During that fight, he saw Gavin fighting with another officer, Robert Felton. Trevino saw that Felton was injured, and Gavin started fighting Trevino too. Eventually, other officers arrived and subdued Gavin.

¶ 24    Felton testified that he was escorting Gavin to the Hearing Board when he saw Trevino in "an altercation" with another inmate. Felton tried to restrain the other inmate, but then a fight broke out involving Felton, Trevino, Gavin, and the other inmate. According to Felton, "everybody involved" was throwing punches, and anyone could have hit anyone else. Felton did not have to seek medical treatment. He also explained that he had contact with Gavin after the incident and had no other problems.

¶ 25    Next, a correctional officer at Stateville Correctional Center testified that, in July 2014, he found in Gavin's cell a lotion bottle containing a "shank." But, on cross-examination, he admitted that Gavin told him the piece of metal was used as a "stinger." Stingers are metal conductors to heat microwavable food without a microwave.

¶ 26    The State's last aggravation witness, James Byrne, an officer in the Cook County Jail, testified that he responded to a call of inmates fighting on September 19, 2007. He saw Gavin with a "shank" that he threw under a door. Byrne recovered the shank later.

¶ 27    Winters's mother read her victim impact statement, and the State read Winters's father's statement.

¶ 28    Gavin's primary witness in mitigation was Dr. Robert Hanlon, who the trial court qualified as an expert in forensic psychology and neuropsychology without objection from the State. He testified that he evaluated Gavin in light of *Miller v. Alabama*, 567 U.S. 460 (2012), because Gavin was 17 and 8 months old at the time of the offense. Hanlon explained that it is "a well-known and widely accepted fact" that adolescent brains are "qualitatively and quantitatively different" than adult brains. Brain development into adulthood includes an increased "process of behavior control, being able to inhibit your tendency to respond impulsively, [and] your ability to understand and predict the consequences of the decisions that you make and the behaviors that you engage in."

¶ 29    Hanlon said it was "absolutely" true that Gavin's brain "had not fully developed" in the relevant area at the time of his offense. As a result, Hanlon agreed, Gavin's immaturity "limit[ed] his] ability to make decisions in the same way an adult would at the time of the offense" and "influenced his behavior at the time of the offense."

¶ 30    On cross-examination, Hanlon acknowledged that he did not talk to anyone who knew Gavin at age 17, did not read the trial transcript, did not talk to the officers or detectives involved in the case, did not talk to witnesses whose statements he reviewed, did not talk to correctional officers who had experience with Gavin, and did not review psychological assessment of Gavin

from age 17. The court also heard from several other mitigation witnesses, whose testimony we detail in our analysis of the sentencing issues.

¶ 31    In ruling, the court acknowledged its obligation to consider Gavin's age in conjunction with *Miller* and juxtaposed that with its view that the offense here "was thought out" because after shooting Winters the first time, Gavin and Bowen came back and shot him again. The court also acknowledged Gavin's "effort to rehabilitate [him]self" while in custody. Considering all of the evidence, the court resentenced Gavin to 33 years in prison.

¶ 32    In terms of custody credit, Gavin's counsel explained:

> "Since this case came back, his murder sentence originally was the one that he was in custody on, not the other ones to which he plead guilty. So when you recalculate, he was arrested on this murder on August 11, 2006. He then was sentenced to four years [in the Illinois Department of Corrections (IDOC)] on the Class aggravated battery. And so that would be at 50 percent, and he would have been in custody on that case August 11, 2006 to August 11, 2008. Then he would have done the two years on the contraband in the penitentiary, which was a Class 1, and that would have been in custody from August 11, 2008 to August 11, 2010. Final sentence would have been the robbery, which was reduced from an armed robbery to Class X, six years IDOC. He would have started that three-year sentence on August 11, 2010, been released on August 11, 2013."

Based on those calculations, counsel informed the court that Gavin's effective custody date for his murder conviction was August 11, 2013, so he would have 1867 days of custody credit. The court agreed, and its order reflects that calculation.

¶ 33                              Analysis

¶ 34     Gavin raises four arguments: (i) trial counsel was ineffective for failing to cross-examine and later call Melvin Holmes to elicit testimony that he was unable to identify the shooter, (ii) trial counsel was ineffective for failing to cross-examine and later call officer Pezdek to corroborate Holmes's non-identification, (iii) his new 33-year sentence, when considered with consecutive sentences in unrelated cases, is actually an unconstitutional 47-year *de facto* life sentence, and (iv) even if his sentence is constitutional, it is excessive.

¶ 35                      Ineffective Assistance of Counsel

¶ 36     The basic principles governing both of Gavin's ineffectiveness claims are straightforward. We evaluate claims of ineffective assistance of counsel under the familiar standard in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Utley*, 2019 IL App (1st) 152112, ¶ 36. To demonstrate ineffective assistance, a defendant must show (i) his or her counsel's performance was deficient and (ii) any deficient performance prejudiced him or her. *Id.* When reviewing Gavin's claims, we will not disturb the trial court's factual findings unless they are against the evidence's manifest weight. We will review the trial court's ultimate legal conclusion about counsel's ineffectiveness *de novo*. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 137.

¶ 37                       *Strickland*'s *Deficiency Prong*

¶ 38     Gavin first argues that counsel was ineffective for failing to cross-examine Holmes and for failing to call him as a defense witness on the issue of his "non-identification of Gavin." He also argues counsel was ineffective for failing to elicit testimony from Pezdek about Holmes's non-identification of Gavin. To show that counsel was deficient in this way, Gavin must show that "counsel's representation fell below an objective standard of reasonableness" with a strong

presumption that counsel's inaction was the result of sound trial strategy. *People v. King*, 316 Ill. App. 3d 901, 912-13 (2000). Gavin acknowledges the questions of who to call as a witness and the manner of cross-examination are traditionally matters of strategy. *Id.* at 913 (decision whether to call certain witness "within the realm of strategic choices"); *People v. Smith*, 177 Ill. 2d 53, 92 (1997) (decision whether to cross-examine "a matter of trial strategy"). That said, even strategic decisions are subject to challenge where "no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *King*, 316 Ill. App. 3d at 916.

¶ 39    The trial court credited Streff's explanation of her decision not to call or cross-examine Holmes about his non-identification—namely, her fear that he could implicate Gavin as the shooter for the first time on the stand. Gavin challenges the trial court's conclusion about Streff's strategy, relying on *King* and *People v. Skinner*, 220 Ill. App. 3d 479 (1991). We find both cases distinguishable.

¶ 40    In *King*, we found no reasonable strategy in trial counsel's "failure to call an available alibi witness who would have bolstered an otherwise uncorroborated defense." *King*, 316 Ill. App. 3d at 916. The alibi witness's testimony, if believed, would have made the defendant's commission of the crime impossible for lack of opportunity. See *id.* at 914-15. Here, in contrast, the trial court found, and Holmes's testimony confirmed, he did not identify someone else as the shooter; instead, he did not identify anyone. More importantly, the reason for his non-identification seems to have been based on his own inability, not Gavin's absence from the scene. When asked whether he saw the shooter, Holmes said, "not clearly" because "everything happened so fast." Because Holmes's testimony was not exonerating, we will not discredit counsel's strategic choice to avoid the risk that his testimony would flip on the stand.

¶ 41    We find *Skinner* distinguishable for similar reasons. There we found counsel ineffective for failing to cross-examine a witness who failed to identify the defendant until six months after a burglary. *Skinner*, 220 Ill. App. 3d at 484. The witness, however, "had a clear and unobstructed view of defendant as he exited the neighboring building carrying the television set in question." *Id.* Here, as we said, Holmes testified that he did not have a clear view of the shooter because of the incident's quickness. The decision to forgo cross-examining Holmes on the issue of his non-identification, where that non-identification is explained at least in part by Holmes's inability to observe the shooter, is not deficient performance. Gavin has given us no reason to second-guess the trial court's factual conclusion that Streff's questioning of Holmes was reasonable, or at least not unreasonable, trial strategy.

¶ 42    Gavin then argues, "no reason existed for Streff not to question Detective Pezdek regarding Holmes's non-identification of Gavin." As to the deficiency prong, Streff alluded to a strategic reason for not cross-examining Pezdek:

> "So the fact that Melvin Holmes did not identify you [Gavin] was a very good fact that we had. But, of course, I wouldn't want to contaminate it by giving Mr. Holmes the opportunity to change his testimony, *or having an officer say*, oh, you know, maybe Mr. Holmes did point to Mr. Gavin." (Emphasis added.)

Gavin challenges this strategy as to Pezdek by emphasizing that his testimony about Holmes's non-identification would be admissible, a contention we do not doubt for our purposes. See *People v. Tisdel*, 201 Ill. 2d 210, 219-21 (2002); *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 77. But to say that counsel could have elicited Pezdek's testimony about Holmes's non-identification is not to say that her performance was deficient for deciding not to.

¶ 43                    *Strickland*'s *Prejudice Prong*

¶ 44    Even if we were to find Streff's performance deficient, Gavin suffered no prejudice from the failure to question Pezdek or further question Holmes about Holmes's non-identification. To show prejudice, Gavin would have to demonstrate "that the probability that counsel's errors changed the outcome of the case is sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008). The probability of a different outcome need not exceed 50%, but we do not consider the alleged deficiency in isolation; instead, we look at the totality of the evidence to determine the impact of the missing evidence on the factfinder's "overall picture of events." *Id.* at 935-36.

¶ 45    The State had two witnesses who identified Gavin. Edwards's identification was memorialized in his written statement, and Pezdek testified that Henderson identified Gavin. We acknowledge that, at trial, Edwards and Henderson both claimed not to remember identifying Gavin before trial. But, whatever weakness imparted to Edwards's and Henderson's testimony by their memory lapses is balanced against the similar weakness in Holmes's non-identification—his inability to clearly see the shooter. We also cannot discount that one of the witnesses received a call from Winters saying that "Ant" shot him, and another witness testified that Gavin was known as "Little Ant." In light of the evidence identifying Gavin as the shooter compared to Holmes's qualified non-identification, we do not think counsel failed to examine or call witnesses who "may [have been] exonerating." See *People v. Davis*, 203 Ill. App. 3d 129, 140-41 (1990).

¶ 46    We also emphasize Streff's ability to explain Holmes's non-identification in closing argument without the testimony Gavin claims Streff should have elicited. During closing

argument, Streff explained that "only two witnesses," Edwards and Henderson, identified Gavin and that Holmes "never identifies Anthony [Gavin]." Streff went on to argue that "if Anthony Gavin was the shooter, Melvin Holmes would have identified him." Simply put, deciding to forgo cross-examination of Pezdek and Holmes did not impede counsel's strategy of arguing Holmes's non-identification.

¶ 47    Gavin has failed to show that his trial counsel performed ineffectively, whether for lack of deficient performance, lack of prejudice, or both. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 22 ("[f]ailure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim" (internal quotation marks omitted)). The trial court correctly denied his motion for a new trial based on trial counsel's alleged ineffectiveness.

¶ 48                                  Sentencing

¶ 49    The trial court originally sentenced Gavin to 50 years in the department of corrections. We vacated that sentence and remanded for new posttrial proceedings for reasons unrelated to the substantive merit of his sentence. See *Gavin*, 2015 IL App (1st) 130701-U, ¶ 49. Because Gavin was 17 at the time of the offense, the trial court sentenced Gavin under section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2018)) and imposed a 33-year prison sentence.

¶ 50    Gavin first alleges his new sentence violates the eighth amendment, the decision in *Miller*, 567 U.S. 460, and the later cases interpreting *Miller*. Because Gavin was a 17-year-old juvenile at the time of the offense, the basic principles are well settled. *Miller* bars mandatory sentences of life without parole for juveniles under 18 at the time of the crime. *Id.* at 465. In *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 724 (2016), the Court held that *Miller* applied

retroactively. In *People v. Holman*, 2017 IL 120655, ¶ 40, our supreme court extended *Miller* protection to discretionary sentences of life without parole. Under *Miller* and its progeny, to sentence a juvenile defendant to a life sentence, or a *de facto* life sentence, a court must consider both a juvenile defendant's age and its hallmark features and the possibility of the defendant's rehabilitation. *Miller*, 567 U.S. at 477-79. Our legislature has codified factors that the court must consider in determining whether a life sentence is appropriate for a particular juvenile offender. See 730 ILCS 5/5-4.5-105(a)(1)-(9) (West 2018).

¶ 51    Of course, all these protections only go into effect if the juvenile offender is serving a life sentence or *de facto* life sentence. Our supreme court has said a sentence greater than 40 years is a *de facto* life sentence for a juvenile offender. *People v. Buffer*, 2019 IL 122327, ¶ 42. There can be no dispute that considered on its own, Gavin's 33-year sentence is not a *de facto* life sentence.

¶ 52    Gavin argues, however, that we must also account for the sentences imposed for three unrelated offenses that he had to serve consecutively with his 33-year murder sentence: (i) a 2005 robbery offense for which he received a six-year sentence, (ii) a 2007 aggravated battery offense for which he received a four-year sentence, and (iii) a 2007 possession of contraband in a penal institution offense for which he also received a four-year sentence. Gavin cites cases from New Jersey and Ohio for the proposition that the consecutive terms for his unrelated offenses should be considered together with his 33-year murder sentence to reach a combined total of 47 years. See *State v. Zuber*, 152 A.3d 197 (N.J. 2017); *State v. Moore*, 149 Ohio St. 3d 557, 2016-Ohio-8288, 76 N.E.3d 1127.

¶ 53    The State does not dispute that Gavin was obligated to serve these sentences consecutively but argues that Gavin cannot combine consecutive prison terms for unrelated offenses to get to the

47-year total for purposes of an eighth amendment claim against his murder sentences. We need not decide whether consecutive sentences for unrelated offenses can be tied together when determining the length of a juvenile sentence because, even if they can, Gavin received credit for the consecutive sentences in his unrelated offenses, and so his time in prison will not exceed 40 years.

¶ 54　Gavin relies on *People v. Peacock*, 2019 IL App (1st) 170308, to argue that we should not consider day-for-day credit when determining whether a sentence constitutes a *de facto* life sentence. We agree wholeheartedly with the reasoning in *Peacock* and do not depart from it here. Gavin's situation, however, differs.

¶ 55　When considering the length of the juvenile offender's sentence in *Peacock*, the State argued that the court could account for day-for-day good conduct credit that could have been *but was not yet* awarded to the defendant. *Id.* ¶ 19 ("Defendant's receipt of day-for-day credit is not guaranteed."). Where the department of corrections retains discretion to decline an award of good time credit, we cannot consider that credit when determining a sentence's length. *Id.* But Gavin offers no reason why we cannot consider credit that IDOC has actually awarded.

¶ 56　During argument at Gavin's second sentencing hearing, counsel explained that Gavin served only three years for the armed robbery offense, two years for the aggravated battery, and two years for the possession of contraband in a penal institution. As Gavin argues now, we can take judicial notice of the IDOC website (*id.* ¶ 4 n.1), and it shows that all of Gavin's sentences imposed before his murder sentence have been discharged. The Unified Code of Corrections defines "discharge" as "the final termination of a commitment to the Department of Corrections." 730 ILCS 5/3-1-2(g) (West 2018). Gavin argues that credit can be revoked "at any time" but cites

no authority for the proposition that IDOC can revoke credit on a sentence a defendant has already served. We similarly have found no authority, either in the Unified Code of Corrections or the Illinois Administrative Code, suggesting that IDOC retains the power to revoke credit for someone whose sentence has been discharged.

¶ 57    So, even if we account for all of the consecutively served sentences, Gavin's aggregate sentence is still only 40 years when considering time actually served. This is the maximum non-life sentence for juvenile offenders in Illinois. See *Buffer*, 2019 IL 122327, ¶ 42. Because Gavin's sentence is not a life sentence, neither the United States nor Illinois Constitutions' protections for juvenile offenders are implicated.

¶ 58    Gavin also argues that his sentence is excessive even if it is not unconstitutional. When sentencing, trial courts must account for both "the seriousness of the offense and *** the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. We review the trial court's sentencing decision for an abuse of discretion, and though the court's discretion is not unfettered, we must be careful not to substitute our judgment for that of the trial court. *People v. Haley*, 2011 IL App (1st) 093585, ¶¶ 63-65.

¶ 59    The trial court made extensive findings after hearing testimony from witnesses on both sides. The trial court found the offense to be "cold" and "brutal" because Winters was initially alive, and then Gavin and Bowen returned to shoot him again. The court distinguished this murder from "a lucky kill shot on a drive-by shooting," describing it as "something that was thought out." Against that, the court acknowledged that it was "somewhat heartened" that Gavin spent his time in prison learning to be a barber and avoiding gangs and "brute force."

¶ 60    The court openly struggled, finding it "very difficult *** to know that [Gavin] made an effort to rehabilitate [him]self," including his expressed desire to work to help other young people who came from adoptive families. Based on the mitigating evidence, the court found "some hope for [Gavin] to become a good citizen." After making its specific findings, the court concluded: "After taking into consideration all that I have heard in the hearing, the mitigation, expert testimony, the doctor's testimony, [Gavin]'s prior criminal history, *Miller v. Alabama* and its progeny, I'm going to resentence [Gavin] on the murder to 33 years."

¶ 61    Gavin emphasizes his rehabilitative potential, but the trial court explicitly acknowledged it. Gavin also argues that the court gave "insufficient consideration" to his difficult childhood. Still, the court considered Gavin's childhood, finding he "had a very supportive family" who was with him in court. The court acknowledged that Gavin's birth mother "had to give [him] up" but concluded that Gavin's adoptive parents "supported [him] and nurtured [him] during [his] school age." Gavin does not suggest that the trial court's conclusion on this score is incorrect.

¶ 62    Ultimately, Gavin asks us to reweigh the aggravating and mitigating evidence differently from the trial court. We do not see an abuse of discretion on this record. Indeed, we commend the trial court for its detailed sentencing findings.

¶ 63    Affirmed.

**No. 1-18-2085**

| | |
|---|---|
| **Cite as:** | *People v. Gavin*, 2021 IL App (1st) 182085 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 06-CR-24305(02); the Hon. Paula M. Daleo, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Christopher R. Bendik, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Veronica Calderon Malavia, and Karin V. Sullivan, Assistant State's Attorneys, of counsel), for the People. |