2024 IL App (2d) 230100-U
No. 2-23-0100
Order filed March 28, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-CF-1274 |
| | ) | |
| JUAN C. GARIBAY, | ) | Honorable |
| | ) | Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  At defendant's murder trial, defense counsel was not ineffective for presenting alibi testimony that not only failed to rebut the State's evidence, but also undercut defendant's exculpatory statement to the police. Regardless of whether counsel's decision was unreasonable, defendant was not prejudiced by the testimony because the remaining evidence overwhelmingly showed that defendant was the shooter.

¶ 2    Following a jury trial in the circuit court of Lake County, defendant, Juan C. Garibay, was

convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)) and aggravated battery with

a firearm (*id.* § 12-3.05(e)(1)) in connection with the fatal shooting of Martin Cervantes and the

nonfatal shooting of Andres Carlin. Defendant argues on appeal that his trial attorney rendered

ineffective assistance of counsel by presenting the testimony of an alibi witness who contradicted defendant's own exculpatory statements to police without otherwise rebutting the State's evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     At trial, Waukegan police officer Brian Steege testified that on August 26, 2021, at about 6:10 p.m., he was dispatched to a home at 1412 Lorraine Place in Waukegan in response to a reported shooting. When he arrived, he observed Carlin lying in a pool of blood in the garage. Areyls Arias was holding a rag to Carlin's head. A video recording from Steege's body camera was played in court. In the recording, Carlin told Steege that defendant "started some bullshit" and "said that he was going to come by with some dudes." Carlin was taken by ambulance to a hospital. Steege remained at the scene and discovered Cervantes lying in a grassy area behind the garage. Cervantes was deceased.

¶ 5     Arias testified that she lived at the Lorraine Place address on the date of the shooting. She was dating Carlin and allowed Cervantes, Carlin's friend, to stay in her garage. She witnessed the shooting, which occurred around 6 p.m. At the time, Cervantes was squatting by Arias's vehicle, putting air into one of the tires. She observed Cervantes get shot in the back. After he was shot, Cervantes "stood up and left."

¶ 6     Carlin testified that on August 25, 2021, a group—him, Arias, Cervantes, defendant, and an unnamed woman—were gathered at the Lorraine Place address. At some point, Arias told Carlin that she thought the other woman was flirting with him. Arias slapped Carlin, which made defendant laugh. Carlin later gave defendant a ride home, and Cervantes rode with them. During the ride, defendant made fun of the rift between Carlin and Arias. Cervantes told Carlin that he should not let defendant disrespect him. Defendant then tried to punch Cervantes. Cervantes

grabbed defendant's hand and punched defendant in the face twice. Carlin told them to stop, and he quickly dropped defendant off at his home in Beach Park.

¶ 7     Defendant later called Carlin and asked him why he did not intervene when Cervantes punched him. Defendant continued to call Carlin repeatedly. Carlin ignored most of the calls but answered one at about 3 p.m. the next day, August 26, 2021. During this call, defendant threatened to beat Carlin and Cervantes when he next saw them. Afterward, Carlin went to the Lorraine Place address. He continued to receive calls from defendant, which he mostly ignored. At some point, he answered a call from a "[p]rivate" caller. The call was from defendant, who again threatened Carlin. Late in the afternoon, Carlin received a call from defendant's brother, Jaime Garibay (Jaime).

¶ 8     At about 6 p.m., Carlin and Cervantes were in the garage when Carlin heard someone screaming that an individual wearing a ski mask was approaching the driveway. Carlin saw that the individual had the same body type as defendant and wore a "Straight Outta Compton" hat. According to Carlin, defendant "used to wear that hat all the time." Upon seeing the individual, Carlin heard shooting and was struck in the head. He felt a burning sensation and then fainted.

¶ 9     Alejandra Cervantes testified that she was Cervantes's cousin. She lived across the street from the Lorraine Place address. At about 6 p.m. on August 26, 2021, while at home, she heard gunshots and saw a man running toward a truck. The man "was wearing red." She clarified that "[s]ome item of clothing [the] person was wearing was red."

¶ 10     Jaime testified that Maria Cazares was his and defendant's mother. Defendant called Jaime on August 26, 2021, and told him he got punched in the eye. Jaime admitted that defendant told him that he was "going to fight with the guys." Jaime denied that defendant told him he was going to fight "the guy who beat him up." However, the State impeached Jaime with his testimony before

the grand jury that defendant said he was going to fight "the guy who beat him up." Jaime acknowledged that he traveled to the Lorraine Place address on the day of the incident. When he arrived, the police and an ambulance were at the scene. Jaime admitted that he told a police officer, "[m]an, I told this guy to call the police before he come over here, my brother."

¶ 11    Waukegan detective Daniel Ramirez testified that on August 26, 2021, he visited the hospital where Carlin had been admitted. Ramirez did not speak with Carlin, who was undergoing surgery. Arias told Ramirez that Carlin's phone number was (\*\*\*) \*\*\*-0401. After Carlin was discharged from the hospital, Ramirez called that number, and Carlin answered.

¶ 12    Waukegan sergeant Barrett Mays testified that on August 26, 2021, at approximately 6:11 p.m., he responded to the report of a shooting at the Lorraine Place address. Mays was advised that defendant was a suspect. Mays learned that defendant used two cell phones, with the numbers (\*\*\*) \*\*\*-5279 and (\*\*\*) \*\*\*-8502. Mays then contacted the phones' carrier to request that it "ping" the phones to ascertain their locations. Every 15 to 20 minutes, the carrier provided "a location or coordinates for the device" by e-mail. At about 7:45 p.m., Mays began receiving e-mails showing that one phone was in Summit. The phone started moving north and stopped at 1105 Park Avenue in North Chicago. The two phones were recovered from the rafters of a garage associated with a house at that address.

¶ 13    Waukegan detective Domenic Cappelluti testified that, en route to the Park Avenue address, he learned that defendant was at the Waukegan police department. Cappelluti returned to the police department and encountered defendant standing in the parking lot with another officer. Defendant said that his mother told him the police were looking for him. Defendant said he wanted to talk to the police. Cappelluti observed that defendant had a black eye.

¶ 14   Because defendant appeared to have been drinking, Cappelluti decided not to interview him immediately. Defendant's clothes were taken, and he was placed in a cell. Defendant was wearing a pair of black sweatpants with a pair of red sweatpants underneath. Cappelluti did not know the exact temperature that evening but recalled that he and other officers were wearing short sleeves and no jackets.

¶ 15   Cappelluti interviewed defendant the next morning. The interview was videotaped, and the recording was played in court. During the interview, defendant stated that his parole officer visited him at his home in Beach Park on the day of the shootings. At some point after his parole officer left, defendant went to a gas station to buy beer. He also went to his girlfriend's house at about 4 p.m. to pick up his truck. Otherwise, he stayed at home. Defendant went to the police department because his mother told him that Carlin had been "hit" and the police were looking for defendant.

¶ 16   Defendant indicated that his phone number was (***) ***-8502, but the phone was in his mother's name. That phone was malfunctioning; he could receive calls on it but could not place calls from it. He sometimes used his daughter's phone to make outgoing calls. He did not know that phone's number. Defendant indicated that his daughter's phone was at home and that he had thrown out the phone with the 8502 number.

¶ 17   Cappelluti asked defendant why he had a black eye. Defendant responded that, two days earlier, one of Carlin's friends punched him while they were riding in a vehicle that Carlin was driving. Defendant denied that he had been to the Lorraine Place address on August 26, 2021. Cappelluti told defendant that Carlin said defendant had shot him and his friend. Defendant denied the accusation. Cappelluti repeatedly told defendant that he knew he had shot Carlin. Defendant vehemently denied involvement in the shooting, insisting that Carlin was his friend. At one point, defendant put his palms together, as if praying, and "promise[d] to God" that he did not shoot

Carlin. When Cappelluti informed defendant his phones had been found hidden "at a girl's house in the garage." defendant expressed surprise, saying, "They were hidden in a garage?" When shown a photograph of the phones discovered at the Park Avenue address, defendant acknowledged that they were his.

¶ 18    Defendant's parole officer testified that he visited defendant at his home in Beach Park on August 26, 2021. The visit lasted from about 3:30 p.m. to 3:54 p.m.

¶ 19    FBI special agent Jeremy Bauer testified that he was a member of the FBI's Cellular Analysis Survey Team, which investigates the historical locations of mobile devices by using records from cell phone companies of interactions between the devices and particular cell towers. The process establishes the general vicinity of the device at a given time. Moreover, a cell tower's geographical range—the area in which it will send a signal to a mobile device—is divided into sectors. Cell phone companies maintain records of the sector where a device is located when it interacts with a particular cell tower.

¶ 20    Bauer performed a location analysis for phones with the numbers (***) ***-5279 and (***) ***-8502, using records of numerous voice, voicemail, and data transmissions, as well as available "timing advance" data, which enabled him to determine the phones' approximate distance from certain cell phone towers. According to Bauer's testimony, the records for August 26, 2021, were consistent with both phones being in the general vicinity of defendant's home at 38285 North Sheridan Road in Beach Park between 3:30 p.m. and 5:45 p.m., then traveling south until approximately 6 p.m., and finally arriving in the general vicinity of the Lorraine Place address at about 6:05 p.m. Bauer noted that, shortly before 6 p.m., a voice call was placed from (***) ***-5279 to (***) ***-0401 (Carlin's phone). The records indicated that the caller blocked the caller ID function before making that call.

¶ 21    Bauer testified that the records for the phone with the 8502 number showed that, at 6:14 p.m., it was located west of the Lorraine Place address. At about 8 p.m., the phone was near 7427 West 56th Street in Summit. At 8:15 p.m., the phone interacted with a cell tower in the Elmhurst area. At about 8:30 p.m., it interacted with a tower north of Glenview. Bauer testified that the records from approximately 9:20 p.m. to 10:30 p.m. were consistent with the phone being near the Park Avenue address. Both phones he analyzed were registered to Maria Cazares.

¶ 22    Ximena Sanchez testified that she lived at the Park Avenue address. She was a casual acquaintance of defendant, who was at her home on the afternoon of August 26, 2021. At some point, she gave defendant a ride home to Beach Park. Later that night, police officers visited Sanchez's home. She permitted them to enter the garage. They came out with two phones. She did not know whom the phones belonged to.

¶ 23    Carol Gudbrandsen, a cybercrime forensic analyst, examined the two phones found in the garage at the Park Avenue address. She extracted data from the phone with the number (***) ***-5279. Between August 25, 2021, and August 26, 2021, there were 26 calls between that phone and a phone with the number (***) ***-0401. Among them were calls from the 5279 number at 4 p.m. and 5:58 p.m. on August 26, 2021. In both cases, the caller blocked the caller ID function.

¶ 24    The forensic pathologist who performed the autopsy on Cervantes testified that he died from a gunshot wound to the chest.

¶ 25    The defense called William Thompson as its sole witness. He testified that on August 26, 2021, he picked up defendant at his home in Beach Park at around 4:30 p.m. They left defendant's residence at around 4:30 p.m. or 5 p.m. and drove to North Chicago to pick up another of Thompson's friends, Manuel. They arrived at Manuel's home at around 5 p.m. or 5:15 p.m. and then headed toward the Logan Square neighborhood in Chicago to deliver money to the mother of

Thompson's son. They arrived at about 6:15 p.m., and Thompson delivered the money. They were there for about 20 minutes. They then returned to Lake County, where Thompson dropped off Manual and defendant. Thompson then went home.

¶ 26    Thompson saw defendant again at about 10 p.m. Defendant asked Thompson to take him to the county jail. Defendant said that the police were looking for him. On the way, they stopped at a liquor store, where they bought four small bottles of tequila. Thompson took two bottles, defendant took two, and they "took the shots." Thompson then drove defendant to the county jail.

¶ 27    After defendant was convicted and sentenced, he filed this timely appeal.

¶ 28                                    II. ANALYSIS

¶ 29    Defendant argues that trial counsel rendered ineffective assistance by offering Thompson's testimony, which failed to rebut the State's evidence and was also thoroughly inconsistent with defendant's statement to police. Our supreme court has recently summarized the principles governing claims of ineffective assistance of counsel:

>      "It is well settled that a criminal defendant has the right to the effective assistance of counsel under both the United States Constitution and the Illinois Constitution. [Citations.] This court has adopted the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), to judge a defendant's ineffective assistance of counsel claim. [Citation.] Accordingly, to prevail on a claim of ineffective assistance of counsel, a defendant must show that his attorney's representation fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. [Citation.] A defendant's failure to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel. [Citation.]

To establish deficient performance, a defendant must prove that counsel's performance, judged by an objective standard of competence under prevailing professional norms, was so deficient that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment. [Citation.] A defendant must overcome the strong presumption that counsel's challenged action or inaction was the product of sound trial strategy. [Citation.] In evaluating an attorney's performance for purposes of an ineffective assistance of counsel claim, that performance must be evaluated from counsel's perspective at the time the contested action was taken. [Citation.]" *People v. Webb*, 2023 IL 128957, ¶¶ 21-22.

¶ 30    Under the *Strickland* standard, prejudice exists when "the probability that counsel's errors changed the outcome of the case is sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008). "The probability of a different outcome need not exceed 50%, but we do not consider the alleged deficiency in isolation; instead, we look at the totality of the evidence to determine the impact of the missing evidence on the factfinder's 'overall picture of events.' " *People v. Gavin*, 2021 IL App (1st) 182085, ¶ 44 (quoting *McCarter*, 385 Ill. App. 3d at 936).

¶ 31    Defendant argues that "presenting William Thompson's testimony, *** was objectively unreasonable, and served only to undermine [defendant's] credibility in an already closely balanced case." Relying on *People v. Barr*, 200 Ill. App. 3d 1077 (1990), defendant makes the broad assertion that "[i]t has long been understood that counsel performs unreasonably by presenting witnesses who contradict the defendant's version of events regarding his conduct at the time of the crime." *Barr* merely held that the defendant could not demonstrate that his attorney's failure to interview alibi witnesses affected the case's outcome, where the witnesses would actually have contradicted the defendant's testimony at trial. *Id.* at 1081. Although the *Barr* court

recognized that "it could well be argued" (*id.*) that counsel would have been incompetent had he called the alibi witnesses, the court did not definitively decide the question.

¶ 32　Regardless of whether counsel's decision to call Thompson as a witness (thereby contradicting defendant's statement to police) was unreasonable, it caused no prejudice within the meaning of *Strickland*. Defendant's theory of prejudice begins with the proposition that before Thompson testified, "the evidence was[,] at the very least, closely balanced" and "[the] case was a credibility contest between the State's evidence and [defendant's] statement." The argument is unpersuasive.

¶ 33　The only issue at trial was the identity of the individual who shot Cervantes and Carlin. Although the perpetrator wore a ski mask, Carlin testified that the perpetrator had the same body type as defendant and wore the type of hat that defendant used to wear "all the time." Moreover, the State presented overwhelming circumstantial evidence establishing that defendant was the perpetrator. Defendant had a motive to retaliate against Cervantes, who had punched him the prior day, and against Carlin, who, in defendant's view, had failed to stick up for him against Cervantes. Defendant's brother testified that defendant told him that someone had punched him, and he was "going to fight with the guys." Carlin testified that defendant called him repeatedly on the day of the shooting. Carlin ignored most of the calls. However, during one of the calls that Carlin answered, defendant threatened to beat Carlin and Cervantes when he next saw them. Carlin answered another call from defendant's phone when the caller ID function had been blocked. Again, defendant threatened him. Carlin had no evident reason to fabricate this testimony, and it was corroborated by phone records showing that defendant's phone was used to place numerous calls to Carlin's phone during the relevant period and that the caller ID function was blocked for some calls. Moreover, shortly after the shooting, an individual wearing an item of red clothing was

observed fleeing the scene. When defendant arrived at the police station, he was wearing a pair of red sweatpants under a pair of black sweatpants, even though the August weather apparently did not require him to dress so warmly. It is reasonable to infer that defendant feared the red sweatpants could be used to identify him, so he tried to conceal them under a second pair.

¶ 34 Furthermore, phone records detailed the approximate location of defendant's phones throughout the day of the shooting and the approximate location of one of the phones in the period after the shooting. The records show that, when the shooting occurred, both phones were in the general vicinity.

¶ 35 Defendant contends that "[f]or every piece of evidence the State presented, [defendant's] statement provided explanations that the jury could have utilized to rebut it." We disagree. In his statement, defendant offered no explanation for Carlin's testimony that defendant called him repeatedly during the relevant time frame and that, when Carlin answered the calls, defendant threatened him. Nor did he explain how, in the roughly 20-minute period before the shootings, both the phone defendant used to make the calls and a phone defendant claimed to have thrown away were tracked traveling from defendant's home to the general vicinity of where the shooting took place. Apparently, defendant would have had the jury believe that, without his knowledge, someone obtained both phones, traveled with them to the general vicinity of the shooting, and called Carlin from one of the phones shortly before the shooting. Such an explanation is simply incredible.

¶ 36 We note that defense counsel vigorously cross-examined Bauer, trying to cast doubt on the precision of the location data Bauer derived. However, counsel did not meaningfully rebut Bauer's testimony that the phones were located a significant distance from defendant's Beach Park home during the periods preceding and following the shootings. Moreover, the location data was

corroborated at certain points. For instance, the data was consistent *both* with defendant being home when he met with the parole officer *and* with the phones being hidden at the Park Avenue address in North Chicago. Finally, if the location data were inaccurate, it would be a remarkable coincidence that the error put the phones in the general vicinity of the shooting of two people defendant knew and had argued or fought with. Again, this is a preposterous theory of the evidence.

¶ 37 Failing to offer any innocent explanation for the State's evidence that even approaches plausibility, defendant focuses on perceived shortcomings in the State's case—the lack of physical evidence (such as DNA, fingerprints, gunshot residue, or a murder weapon) connecting defendant to the crime. Notwithstanding the absence of such evidence, however, the evidence that the State *did* present was extraordinarily incriminating.

¶ 38 Defendant argues that, given that he repeatedly, emphatically, and unwaveringly maintained his innocence during 48 minutes of intense questioning by Cappelluti, there was a significant chance that, but for the misguided decision to present Thompson as an alibi witness, the jury would have believed defendant's statements to police. We disagree. It does not take an uncommonly skilled liar to feign indignance and anger when faced with truthful accusations of wrongdoing. Cappelluti's interviewing style was confrontational but not especially hostile. He tried to gain defendant's trust. That technique is often effective but does not guarantee securing a confession from every guilty subject. That defendant could endure less than an hour of questioning by Cappelluti hardly attests to his innocence.

¶ 39 Obviously, the State did not introduce the recorded interview into evidence for defendant's benefit. Undoubtedly, the State recognized that, when viewed in light of the overwhelming circumstantial evidence of defendant's guilt, the recorded statement showed him being caught in a lie in real-time. It is firmly established that "[a] false exculpatory statement is probative of a

defendant's consciousness of guilt." (Internal quotation marks omitted.) *People v. Milka*, 211 Ill. 2d 150, 181 (2004).

¶ 40     At the close of the State's case-in-chief, the evidence was far from closely balanced. Had defendant rested without presenting any evidence to contest the charges, he would almost surely have been convicted. Thus, whatever effect Thompson's testimony had on the jury's deliberations, it could not plausibly have tipped the balance against defendant. There was no reasonable probability that the proceeding's outcome would have favored defendant if counsel had refrained from calling Thompson as a witness. Thus, defendant suffered no prejudice within the meaning of *Strickland.*

¶ 41                             III. CONCLUSION

¶ 42     For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 43     Affirmed.