2022 IL App (1st) 210590-U

No. 1-21-0590

Order filed November 14, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 DV 61746 |
| | ) | |
| KENNETH COPELAND, | ) | Honorable |
| | ) | Tommy Brewer, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's denial of defendant's posttrial motion claiming ineffective assistance of counsel is affirmed where counsel's decision not to raise self-defense, but instead, rely on the State's inability to prove its case, was reasonable trial strategy.

¶ 2    Following a bench trial, defendant Kenneth Copeland was convicted of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2018)) and sentenced to six months of conditional discharge and an anger management program. On appeal, defendant contends that his trial counsel was

ineffective for failing to raise a self-defense argument, call three witnesses and introduce medical records and a police report in support of such an argument, and use medical records and social media posts to impeach the victim. For the reasons that follow, we affirm.

¶ 3     Defendant's conviction arose from a physical altercation with his sister, Katrina Copeland, on August 14, 2019, during a family gathering at their mother's house in Matteson, Illinois.[1] Following arrest, defendant was charged with domestic battery. The misdemeanor complaint alleged that defendant knowingly caused bodily harm to Katrina in that he threw her to the ground and punched her twice in the head.

¶ 4     Defendant was represented at trial by Ronald Draper. On the morning of trial, the State tendered Draper a compact disc containing Katrina's medical records. The trial court asked Draper whether he would be able to view the records in the court library. Draper said he did not know, but that he did not think the medical records were "that germane to the case anyway."

¶ 5     At trial, Katrina testified that on the day in question, numerous members of her family gathered at her mother's house. By the time of the events at issue, the only family members still at the house were Katrina; defendant; their mother, Barbara Copeland; their sister, Kimberly Copeland; defendant's wife, Rosio Copeland; and defendant's two small children.

¶ 6     Around 6:45 p.m., Katrina and defendant were "having a back and forth verbal argument" while she looked for her shoes under the dining room table. Defendant started to take a glass of water to Barbara, who was in her bedroom "down the steps," but then ran back up the stairs with the glass of water. As Katrina was "coming up from looking under the table," he threw water in

---

[1]Because many of the members of defendant's family share last names, we will refer to them by their first names if referenced more than once.

her face. He then grabbed her arms, threw her onto the floor, and repeatedly hit the back of her head and neck with the glass. When Katrina tried to stop him, she "got a cut in [her] hand." She also suffered two large lacerations on her neck and multiple lacerations throughout her scalp and behind her ear. Defendant stopped striking Katrina when Kimberly pulled him off her. Eventually, Katrina went to the police station and then the emergency room, where she received a total of 32 stitches to her head, neck, and hand.

¶ 7    On cross-examination, Katrina acknowledged that she had used the name "Katrina Shakur" on her Facebook page. She clarified that at some point while defendant was hitting her with the glass, the glass broke. When asked to "identify the injury in the back of your head," Katrina answered that Draper should ask the emergency room doctor. The court interjected, asking Draper whether he had reviewed the medical records. Draper answered, "No, Judge. That's not my question. My question is, can you identify the lacerations that you say you have in the back of the head?" Katrina answered, "There are all lacerations all through my scalp. You should look at the medical report." The court interjected again, stating, "Counsel, I think you should review the medical reports." Draper answered, "Okay, Judge. I'll move on." Thereafter, Katrina denied threatening, striking, or touching defendant.

¶ 8    Kimberly testified that around 6:45 p.m., defendant and Katrina were "going back and forth with words" regarding how to lay their other sister to rest, as she had passed away that morning. Katrina called defendant "a name" as he was walking downstairs with a glass of water. He ran back up the stairs, charged at Katrina, and threw water in her face. Katrina bent down "like this trying to get the water out of her face." Defendant swung with the hand holding the glass and hit Katrina. He then threw Katrina to the floor and "proceeded to hit her again with his fist on the side

of her face, on the side of her neck like this to her head." Defendant punched Katrina three or four times before Kimberly pulled him off her. Katrina did not strike defendant at any time or make any prior physical contact with him.

¶ 9    According to Kimberly, Rosio and defendant's two young children were present for the physical altercation. Kimberly had "screamed" to Rosio to help her get defendant off Katrina, but Rosio did not help. Barbara took Kimberly's phone and told Kimberly she "was not going to call the f***ing police on her son." Defendant, Rosio, and the children left shortly thereafter. Kimberly used towels to try to stop the bleeding from the wounds on Katrina's neck. She then accompanied Katrina to the police station and the emergency room.

¶ 10    On cross-examination, Kimberly stated that she saw cuts or bruises on the back of Katrina's head. She acknowledged that earlier on the day in question, she had argued with another sister, Joyce Keith. Family members, including defendant, interceded and "pushed [them] apart before it could be physical." Kimberly denied having had a physical confrontation with Joyce's daughter, Lauren Stewart, that afternoon. However, she admitted having been arrested that day for battering Stewart. She stated that the case against her was dismissed due to insufficient evidence, but acknowledged that an order of protection was put in place.

¶ 11    Matteson police officer Jill Flores testified that she spoke with Katrina and Kimberly at the police station. She learned that the family had gathered to make plans for a service for a sister who had recently passed away, and "that there was an altercation between some family members mainly with her brother, [defendant]." Flores observed that Katrina was bleeding and had some cuts on the left side of her neck and behind her left ear.

¶ 12     On cross-examination, Flores stated that Katrina reported she had been punched in her head by her brother. She did not recall whether Katrina reported any cuts on her body, the back of her head, or the top of her head. Katrina did not say she struck her brother. Rather, she said she fought back and "the initial was him throwing water in her face." Katrina also reported that defendant pushed her to the ground and started striking her while she was on the ground. She further stated she was not sure whether his cutting her was intentional or not.

¶ 13     On redirect, Flores clarified that Katrina reported that when defendant threw her to the floor, the glass broke in his hand. He struck her twice in the head with his closed fist and, when she got up off the floor, she realized she was bleeding. Katrina told Flores she "did not know if it was intentionally that he cut her or if it was in the tussle that she received the cut."

¶ 14     Defendant made a motion for a directed finding, which the trial court denied.

¶ 15     Joyce testified for the defense that around 5:30 p.m. on the day in question, she went to Barbara's house to discuss locations for her sister's memorial service with various family members. She and Katrina were "arguing going back and forth." Kimberly called Joyce a name and she and Joyce were "in each other's face." Defendant started pushing Kimberly out of the room. When Stewart told everyone to stop, Kimberly swung at Stewart and hit her in the lip. Joyce "started going ballistic towards Kimberly" but no one touched anyone. Joyce's husband, Dexter Keith, grabbed Joyce and Stewart and took them outside. Joyce did not go back inside Barbara's house that day.

¶ 16     Stewart testified that she witnessed a verbal altercation between Joyce and Katrina. When she tried to break up the argument, Kimberly punched her in the lip. Stewart left Barbara's house five minutes later.

¶ 17    Barbara testified that on the day in question, Kimberly "had harsh words directed towards Joyce," Kimberly hit Stewart, and there was a "struggle" between defendant and Katrina. When asked whether she was present for the struggle between defendant and Katrina, Barbara answered, "I was coming up the stairs as they were getting ready to hit the floor." She specified that she saw defendant tossing water on Katrina, after which Katrina "ran into him" or "barrel[ed] into him" and "they hit the floor." Barbara did not see defendant "slam" Katrina to the floor. Rather, Katrina "got on the floor" due to the water, which had caused the floor to be slippery. Defendant and Katrina "were struggling back and forth" and seemed to be rolling or struggling to get up. Barbara did not see defendant punch Katrina at any time and did not see a glass in his hand.

¶ 18    Barbara saw Kimberly jump on defendant's back. However, when asked whether anyone separated defendant and Katrina, she said "it was more so of them getting up on their own." Barbara heard Katrina tell defendant, "I'm going to kill you. You're going to die. You're going to pay for this."

¶ 19    On cross-examination, Barbara stated that although she had not made it all the way up the stairs, she could see "that whole area." She clarified that she saw defendant toss water on Katrina, Katrina "barreling into" defendant, and the two making physical contact as they "slipped and hit the floor." She did not know where the glass was at the time, but did not see it in defendant's hand. Barbara agreed that she did not attempt to separate defendant and Katrina. When asked whether Rosio was present, Barbara answered, "[Rosio] was there, yes, but I can't recall if she was still in the room because I know she had gotten the babies and taken them outside." Barbara stated that after defendant and Katrina got up from the floor, she saw that Katrina's neck and defendant's hand were cut. She attempted to help Katrina. No one attempted to call the police.

¶ 20    In closing, Draper argued that the court should find Barbara's testimony credible, as she was not involved in any arguments with any of her family members. He characterized Katrina and Kimberly as "evasive" and asserted that the credible evidence at trial did not establish defendant "ever attempted to create bodily harm toward Katrina." Further, highlighting Kimberly's and Joyce's testimony that defendant separated them earlier in the day, thereby preventing a physical confrontation, Draper argued that such action showed defendant was not "an individual who would choose to batter any of his sisters." Draper concluded that the evidence left more than a reasonable doubt of defendant's guilt.

¶ 21    The State countered that Katrina and Kimberly were credible and, in contrast, Barbara "didn't see much of what happened" and was not credible.

¶ 22    The court found defendant guilty of domestic battery. In announcing its judgment, the court stated it found Katrina and Kimberly credible and Barbara incredible. It further noted that Katrina suffered some severe injuries and stated, "I don't think she suffered them from just merely falling."

¶ 23    Following trial, two attorneys from the Blake Horwitz Law Firm requested leave to file an appearance in place of Draper. The trial court denied the request but allowed the new attorneys to appear as co-counsel.

¶ 24    The new attorneys filed a timely motion for a new trial, arguing that Draper provided ineffective assistance of counsel. Factually, the motion alleged that Katrina charged at defendant, he threw water in her face to defend himself and dropped the glass, and then, while he struggled to defend himself from Katrina, they both slipped and fell onto the wet floor, cutting themselves on the broken glass. The motion further alleged that defendant and Rosio "both wanted to testify,

but Mr. Draper convinced them not to as he was confident that Barbara's testimony would be enough."

¶ 25    The motion asserted that Draper was ineffective for failing to present self-defense as an affirmative defense, for convincing defendant and Rosio not to testify despite their desire to do so, and for failing to call Dexter to testify, even though he was present at court and waiting to be called. The motion further alleged Draper was ineffective for failing to review Katrina's medical records to determine the nature of her injuries and the comments she made to medical personnel, and for failing to impeach her with threatening posts she made on social media. Finally, the motion contained an allegation that Draper had a history of disciplinary action. The motion asserted that Draper's actions could not be justified as trial strategy and that his failures prejudiced the defense.

¶ 26    Defendant's new attorneys thereafter filed an amended motion for a new trial, adding details of defendant's and Rosio's proposed testimony, including that they would have testified that less than ten minutes prior to defendant throwing the water, Katrina had attacked him, repeatedly punching him in the head and back. The amended motion also included details of Dexter's proposed testimony that Katrina had attacked and repeatedly punched defendant earlier in the evening. The motion added an allegation that Draper had failed to call defendant's sister, Elaine Barnes, to testify that Katrina called her after the incident and stated she did not need an ambulance, and failed to introduce defendant's medical records, which revealed he was diagnosed with a concussion one week after the incident. The motion further alleged that Katrina's medical records revealed she told medical personnel that she suffered her injuries during a fight with her boyfriend. Attached to the motion were excerpts of defendant's medical records, an excerpt of

Katrina's medical records, screenshots of two social media posts, and affidavits from Rosio and Dexter.

¶ 27    When the case was called on August 19, 2020, Draper was not present. The trial court indicated it was "not going to hear witnesses in support of [the] motion," as the motion was "extensive" in describing what the witnesses' testimony would have been had they been called at trial. Defense counsel argued that Draper's representation of defendant was "substantially inadequate," as he had not presented evidence from three witnesses that Katrina punched defendant four times in the head and face ten minutes before the battery at issue, and then threatened to kill defendant just before charging him with fists raised and hitting him in the head and face. Counsel noted that the defense had medical records to corroborate the claim that defendant was punched in the head, as well as impeaching evidence of Kimberly in that three witnesses were available to testify that Katrina refused an ambulance when asked if she wanted one.

¶ 28    The State countered that two of the new proposed witnesses were not present during the incident and that defendant chose to exercise his right to remain silent at trial. The State argued that the attached medical records pertaining to defendant did not include an actual diagnosis of concussion and those pertaining to Katrina contained a scrivener's error in referring to a "boyfriend." The State also argued that not calling 911 was not the same as calling an ambulance and that Draper's 12-year-old attorney disciplinary matters did not have any bearing on the instant case. The State concluded that Draper had called three credible witnesses, that none of the proposed witnesses would "bear any significant weight," and that Draper was not ineffective.

¶ 29    In rebuttal, defense counsel argued that there would be new testimony showing that Kimberly struck defendant in the head and face 10 minutes before the alleged battery, and that

such testimony would both show defendant's state of mind and speak to Kimberly's credibility. Counsel asserted that the defense had shown the existence of errors made by trial counsel that would undermine confidence in the outcome of the trial.

¶ 30    The trial court continued the case for a written ruling.

¶ 31    On August 28, 2020, defense counsel filed a motion to supplement the amended motion for a new trial. The motion included an allegation that Katrina made a specific threat to kill defendant immediately before she charged at him with clenched fists, and then hit him in the head and face. The motion also asserted that, had they been called as witnesses, defendant, Rosio, Dexter, and Elaine would have testified that Katrina had an aggressive and violent character, and detailed several incidents as examples. According to the motion, the testimony would have supported a finding that Katrina was the initial aggressor and would have severely impeached her credibility. Counsel also attached a supplemental police report noting that defendant had "some bruising under his right eye," and asserted that although the report would have supported testimony that Katrina punched defendant, Draper did not call the authoring officer to testify.

¶ 32    When the case was called on October 14, 2020, Draper was present. The trial court reconsidered its position about not hearing live testimony from witnesses. The State pointed out that the motion was before the court for ruling, but the court indicated it "would like to make that ruling after attorney Draper has testified in this matter" and that the defense "may call four witnesses, maybe one." With Draper present, the court set a date and time for a hearing.

¶ 33    On November 24, 2020, new defense counsel filed a motion to hold Draper in contempt of court. According to the motion, Draper had not appeared for the scheduled hearing or for a

rescheduled hearing, and subsequent attempts to subpoena him were unsuccessful. The trial court issued, but later withdrew, a rule to show cause against Draper for his failure to appear.

¶ 34    When the case was ultimately called for hearing on the motion for a new trial on March 9, 2021, Draper was not present.

¶ 35    At the hearing, Rosio testified that around 6 p.m. on the day in question, she was at Barbara's house with her two small children. Barbara, defendant, Joyce, Dexter, Stewart, Kimberly, and Katrina were also at the house. Kimberly and Joyce had an argument. When defendant moved to stand between them, Katrina got up from where she had been sitting on the couch and punched him in the head four times. Joyce and Stewart announced they were leaving. Defendant briefly went into Kimberly's room and then, a minute or two later, went down the stairs to the basement. Another minute or two later, defendant came back upstairs and asked where Joyce and Dexter were. Rosio told him they had left. Defendant went into the kitchen.

¶ 36    When defendant came out of the kitchen, he said to Katrina, "[W]e weren't raised like this, you could have helped me deescalate the whole situation." Katrina responded, "[N]o one's gonna tell me what to do. No M-fer is going to tell me what to do." She also said, "[M]y mom's gonna have two funerals today," and "I'll kill you." Rosio described Katrina as "extremely mad" and said that her hands were "wailing in the air." Katrina then jumped off the couch and "went towards" defendant, yelling, screaming, cursing, and saying "I'm going to kill you." Defendant, who had a glass of water in his hand, threw the water at Katrina. Katrina stopped for a moment and then "just started swinging at him, throwing punches at him." According to Rosio, Katrina punched defendant's face and head.

¶ 37    At this point in the hearing, the trial court indicated that it would not consider Rosio's testimony and would not allow the State to cross-examine her. With regard to Dexter, the court stated that the "thing that's wrong with his [proposed] testimony" was that he was not present at the moment where self-defense would have been at issue. As such, the court did not see "how he could make the case."

¶ 38    The court denied the defense request to call other witnesses who would "give a different account of what happened." The court explained that it had judged the credibility of the witnesses at trial, and stated, "But, counsel, I don't see how calling witnesses to contradict the facts as I have found them to be is helpful to your motion." Reiterating that Rosio's testimony was "just a contradiction" of the trial testimony and that it had "made [its] findings," the court stated that the defense's best witness would have been Draper. Given Draper's absence at the hearing, the court indicated it would hear testimony from defendant regarding his conversations with Draper and what his expectations were of his attorney.

¶ 39    Defendant testified that he had spent at least 10 hours with Draper preparing for trial. Prior to trial, he had told Draper that Katrina punched him on two occasions on the day in question: first, she punched him four times when he was trying to break up a fight; and second, she punched him after she threatened and charged him. With regard to the threats, defendant told Draper that Katrina said she "was going to shoot my a*** and also that my mother will have two funerals." According to defendant, Draper said, "[O]kay, great, we're going to use self-defense." Draper also wrote down Katrina's threats and said the defense "would use it." However, no testimony was elicited at trial regarding Katrina threatening or punching him.

¶ 40    Defendant further testified that he saw a doctor the day after the incident and again the following week. He gave medical records he received from those visits to Draper. The records were not introduced at trial and no medical professionals were called to testify at trial.

¶ 41    On several occasions prior to trial, defendant discussed raising self-defense with Draper, and Draper had defendant and Rosio describe the incident to him several times. It was defendant's understanding that the affirmative defense would be utilized at trial, and that he, Rosio, Joyce, Dexter, and Barbara would all testify. Draper told defendant that he would subpoena Dexter. However, Draper did not do so, and, as a result, Dexter had to leave the courthouse to go to work and was unable to testify at trial. Finally, defendant stated that he and Draper prepped for him to testify, and that he found out he would not be testifying at trial "[r]ight before it ended."

¶ 42    On cross-examination, defendant clarified that most of the 10 hours he spent with Draper preparing for trial included Rosio. He acknowledged that he was present for trial, that Rosio was in the courthouse, and that Dexter was in the courthouse at least for the morning.

¶ 43    Defendant's new attorneys argued that Draper was ineffective for failing to raise a self-defense argument and failing to present evidence to support such an argument in the form of medical records and testimony from defendant, Rosio, and Dexter. The attorneys asserted that had Draper presented this evidence, it would have undermined confidence in the outcome of the trial. They argued that self-defense was "really the only defense [defendant] had" because multiple witnesses testified he threw water in Katrina's face, which "in and of itself could be considered a battery," but no evidence was presented showing he had done so because Katrina punched him twice earlier in the day and threatened him. They further argued that Dexter's testimony would

have been relevant to a claim of self-defense because it would have spoken to the identity of the initial aggressor and to defendant's state of mind.

¶ 44   The State argued that where defendant testified he and Draper spent at least 10 hours together, Rosio was present for most of that time, and they discussed self-defense, the conclusion to be drawn was that Draper did not feel raising self-defense was appropriate. The State noted that Draper was attentive at trial, made objections, asked for clarification regarding questions that were asked, and called three witnesses to testify. Asserting that "attorneys are given a pretty tremendous amount of latitude when it comes to trial strategy," the State maintained that Draper was not ineffective.

¶ 45   The trial court denied defendant's motion. In doing so, the court stated it had observed the witnesses at trial, found Katrina's and Kimberly's testimony "to be extremely credible," found Stewart's testimony not relevant to the issue of whether defendant committed battery, and found Barbara's testimony incredible. The court also stated that it had observed Draper at trial, and noted he had called witnesses and cross-examined the State's witnesses "in a very professional manner in a high degree of preparedness." The court then stated as follows:

> "Now, if they discussed self-defense, maybe it was the trial strategy. I can't rule it out. I can't rule out the fact that he didn't find merit to their notion. I cannot think of a reason why an attorney would have testimony about striking but none about the complainant against the defendant, but allowed the testimony, and just say, well, we got self-defense but we're just not using it. I just don't believe that.
>
> I think what we have here is a contradiction in what after the fact the defendant thought that the evidence would show. But I found nothing in counsel's action during the

pendency of the case or the trial that said his action prejudiced the defendant to the extent that it denied him a fair trial. On the basis of that, I'm denying the motion for a new trial."

¶ 46 On April 13, 2021, the trial court sentenced defendant to six months of conditional discharge and an anger management program. Defendant filed a timely notice of appeal, specifying that he was appealing from the denial of his "motion for a new trial *** and conviction."

¶ 47 On appeal, defendant contends that he received ineffective assistance of trial counsel.

¶ 48 Every defendant has a constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const.1970, art. I, § 8. Claims of ineffectiveness are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668, (1984). See *People v. Albanese*, 104 Ill. 2d 504 (1984). To establish a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland*, 466 U.S. at 687.

¶ 49 More specifically, a defendant must demonstrate that his counsel's performance was objectively unreasonable under prevailing professional norms (*id.* at 694), overcome a "strong presumption" that counsel's alleged error was part of a "sound trial strategy" (*People v. Houston*, 226 Ill. 2d 135, 144 (2007)), and establish that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*Strickland*, 466 U.S. at 694). In reviewing a trial court's denial of a defendant's posttrial motion claiming ineffective assistance of counsel, we will reverse only if the trial court's decision was manifestly erroneous. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25. "Manifest error" has been defined as error that is clearly plain, evident, and indisputable. *Id.*

¶ 50    In this court, defendant contends that Draper was ineffective for failing to raising a self-defense argument at trial, and argues that his decision not to do so cannot be justified as trial strategy that is immune from a claim of ineffectiveness. Defendant denies hitting Katrina or causing the injuries to her head and neck. Nevertheless, he asserts that Draper had no strategic reason for not raising self-defense as an affirmative defense, as it was "undisputed that [he] threw water in Katrina's face" and this "mere act *** , without justification, could constitute a battery." He argues that Draper should have, but failed to, supported a self-defense argument by: (1) calling him, Rosio, and Dexter to testify; (2) introducing his medical records; (3) introducing a police report documenting his injuries; (4) reviewing and introducing Katrina's medical records; and (5) introducing Katrina's threatening Facebook posts.

¶ 51    Whether to present a particular theory of defense is a decision made by trial counsel that constitutes a matter of trial strategy. *People v. Little*, 2021 IL App (1st) 181984, ¶ 52. Specifically, "it is counsel's decision, as a matter of trial strategy, whether to assert an affirmative defense of self-defense." *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 40. Typically, a decision that involves a matter of trial strategy will not sustain a claim of ineffective assistance of counsel. *People v. Sanchez*, 2014 IL App (1st) 120514, ¶ 30. Because counsel's strategic choices are "virtually unchallengeable," the fact that another attorney may have chosen a different strategy, or that the strategy employed by counsel was ultimately unsuccessful, does not establish ineffectiveness. *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). Errors in trial strategy constitute ineffective assistance only if counsel entirely fails to conduct any meaningful adversarial testing. *People v. Custer*, 2019 IL 123339, ¶ 39.

¶ 52    In this case, the record demonstrates that Draper's strategy was to rely on the State's inability to prove defendant committed the charged offense, that is, that he knowingly caused bodily harm to Katrina by throwing her to the ground and punching her in the head. To this end, Draper called Barbara as a witness to testify that defendant did neither of these things, and, in closing arguments, asserted Barbara was credible and suggested Katrina and Kimberly were not. Moreover, according to the initial posttrial motion, Draper discussed this defense strategy with defendant and Rosio, as he "convinced them not to [testify] because he was confident that Barbara's testimony would be enough." Relying on the State's inability to prove its case is a reasonable trial strategy. See *People v. Gillespie*, 276 Ill. App. 3d 495, 503 (1995).

¶ 53    A theory of self-defense would have been inconsistent with the theory put forth at trial that defendant merely threw water at Katrina, who ran into him, they both slipped on the water and fell to the floor, and any injuries that resulted were incurred accidentally during their ensuing struggle to regain their footing. Defendant's current argument for self-defense is premised on his act of throwing water in Katrina's face, rather than on the charged conduct of throwing Katrina to the ground and punching her. However, the affirmative defense of self-defense has the legal effect of *admitting* that the acts occurred, but denying legal responsibility for them. *People v. Freneey*, 2016 IL App (1st) 140328, ¶ 32. The raising of self-defense " 'necessarily constitutes an admission by the defendant that he committed the crime for which he is being prosecuted.' " *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 44 (quoting *People v. Raess*, 146 Ill. App. 3d 384, 391 (1986)). Thus, in order to invoke self-defense, defendant would have had to admit to committing the battery *as charged*.

¶ 54    Here, the conduct alleged in the criminal complaint was that defendant threw Katrina to the ground and punched her. A claim of self-defense would have been inconsistent with the theory put forth at trial that he did not take either of these actions and Katrina's injuries were accidental. See *Freneey*, 2016 IL App (1st) 140328, ¶ 32 (a defendant "cannot on one hand argue that he only accidentally struck [the victim] but on the other argue that he intentionally and justifiably struck [the victim] in self-defense"); *People v. Jones*, 234 Ill. App. 3d 1082, 1098 (1992) (a theory of self-defense is inconsistent with a theory that the defendant was not involved in the charged crime). An attorney's choice of trial strategy "is virtually unchallengeable if such choice was made after a thorough investigation of the law and facts relevant to plausible options." *Jones*, 234 Ill. App. 3d at 1098. The record in this case shows that Draper investigated and prepared defendant's case and reasonably chose to argue his innocence of the charged battery, rather than a justification for it. See *id.*

¶ 55    We cannot say that Draper entirely failed to conduct any meaningful adversarial testing of the State's case (see *Custer*, 2019 IL 123339, ¶ 39), or, in turn, that the trial court's decision to deny defendant's posttrial claim of ineffective assistance of counsel was manifestly erroneous (*Tolefree*, 2011 IL App (1st) 100689, ¶ 25). Given our determination that Draper's decision not to pursue a self-defense argument at trial was not objectively unreasonable under prevailing professional norms, we need not address defendant's arguments regarding the specific actions he faults Draper for not taking in support of such a theory of defense.

¶ 56    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 57    Affirmed.