2025 IL App (1st) 230182-U

No. 1-23-0182

Order filed March 19, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16 CR 18270 |
| SIRENA CROSBY, | ) ) ) | Honorable Dennis J. Porter and Michael R. Clancy, |
| Defendant-Appellant. | ) | Judges, presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Justices Martin and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the trial court's denial of defendant's motion for a new trial where defendant failed to establish trial counsel's performance was deficient.

¶ 2    Following a jury trial, defendant Sirena Crosby was found guilty of first degree murder and sentenced to 45 years' imprisonment. Defendant appeals, arguing the trial court erred in denying her motion for a new trial because trial counsel was ineffective for failing to call two alibi witnesses. We affirm.

¶ 3    Defendant was charged by indictment with six counts of first degree murder for the shooting death of Ireal Mitchell. The State proceeded on counts I and II, which respectively alleged that, while armed with a firearm, defendant shot and killed Ireal Mitchell intentionally or knowingly (720 ILCS 5/9-1(a)(1) (West 2016)) and knowing such act created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2016)). Defendant retained private counsel.

¶ 4    At the October 2019 trial, the parties stipulated that Ireal Mitchell's cause of death was a gunshot wound to the torso and upper arm and that the manner of death was homicide.

¶ 5    Kendra Owens testified that on August 8, 2016, she was watching her friends Ireal, then 22 years old, and Michael Mitchell Jr., also known as "Mike Mike," then 13 years old, play basketball at a court near West Polk Street and South Springfield Avenue in Chicago.[1] Owens lived nearby on Polk in the building next door to Mike Mike and his father, who is also named Michael Mitchell Jr. and nicknamed "Big Mike." Defendant was Big Mike's girlfriend. Mike Mike and Big Mike lived with defendant in her second-floor apartment, along with her four children, her cousin, and the cousin's child.

¶ 6    During the basketball game, Ireal slapped Mike Mike, who became upset and went home. A few minutes later, Mike Mike returned with defendant and a man named Travis Washington. Defendant approached the players on the court and demanded to know "who smacked [her] son." Mike Mike pointed to Ireal, who admitted he slapped Mike Mike because he was "being disrespectful." Ireal said he would apologize to defendant but not to Mike Mike. Defendant

---

[1] Because Michael Mitchell Jr. and his father Michael Mitchell Jr. share the same name, including the suffix, we follow the parties' usage in referring to them by their nicknames "Mike Mike" and "Big Mike," respectively. We refer to Ireal Mitchell, who is unrelated, by his first name.

"became angrier" and "started yelling." Defendant told Washington, "let's go get the gun." Defendant, Washington, and Mike Mike left, going toward defendant's apartment. Owens also went home. Later that day, she learned Ireal had been shot and killed. Owens later identified defendant and Washington to police in photo arrays. On cross-examination, she said she had seen a Facebook post showing that Washington had a firearm, though she did not see him with a firearm that day.

¶ 7    Tavon Tanner, who was 10 years old on August 8, 2016, testified that he lived with his family in the first-floor apartment beneath defendant's home on Polk. Around 7 p.m., he was on the front porch when Mike Mike returned from the basketball court. Mike Mike was "mad" that someone had slapped him and went inside to find Big Mike. Mike Mike emerged shortly after with defendant and walked toward the basketball court. Five minutes later, Mike Mike and defendant returned, and defendant said that "he was going to die, she [was going to] kill him."

¶ 8    Defendant told everyone to go inside, and Tanner went to defendant's apartment. While Tanner was there, Big Mike arrived. Tanner saw defendant enter her bedroom and heard her open her closet door and say, "[M]ake it look like it came from downstairs." Tanner then saw defendant exit the back door of the apartment, get into the driver's seat of her silver four-door vehicle, and drive away.

¶ 9    Tanner entered his apartment and, shortly thereafter, heard gunshots coming from the direction of the basketball court. Around the same time, he saw Big Mike, Mike Mike, defendant's children, defendant's cousin, and her child leave the building and enter Big Mike's BMW. Tanner never saw defendant again.

¶ 10    Later that night, around 10 p.m., Tanner was sitting on his front porch with family members when someone shot at them. Tanner sustained a gunshot wound to his back. On cross-examination, Tanner admitted that Washington, his sister's boyfriend at the time, had gone with defendant and Mike Mike to the basketball court; Tanner said he lied about it during direct examination because he did not want Washington to get in trouble.

¶ 11    Chicago police officer Thomas Bishop testified that around 7:30 p.m. on August 8, 2016, he heard gunshots and observed people pointing southbound on Springfield. Bishop observed a gray vehicle driving away at a high speed. Bishop initially gave chase but lost sight of the vehicle. He returned to where he had heard the gunshots, observed a body on the sidewalk, later identified as Ireal, and called for an ambulance.

¶ 12    Chicago police detective Patrick Brown testified that he arrived at the scene after emergency personnel had removed Ireal's body. Brown observed blood on the sidewalk, bloody clothes, bullet fragments, and a shell casing. He viewed surveillance footage from cameras on two apartment buildings nearby; the footage captured the shooting. Brown interviewed three men who were outside an apartment building on Springfield during the shooting: Waymond Perry, Joseph Rochford, and Ronald Dozier. Another individual, Mitchell Ellis, reported that a man named Terrance White was with Ireal when Ireal was shot. Police learned White was in the custody of the Illinois Department of Corrections, and Brown interviewed him at the Joliet Correctional Center. Brown was present when a correctional officer administered a photo array to White, who identified defendant as the person who shot Ireal. Brown was also present when White gave a videotaped statement about the shooting to an assistant state's attorney.[2]

---

[2] White's videotaped statement was published but is not included in the record on appeal.

¶ 13    On cross-examination, Brown testified that defendant was number one in a photo array viewed by Rochford. Rochford identified the shooter as "either no. 1 or no. 2." In a live lineup, Rochford identified number three, but defendant was number one.

¶ 14    Perry and Rochford testified that they were standing outside on Springfield when they heard gunshots. They saw an African-American woman driving a silver vehicle southbound on Springfield fire approximately five gunshots. A young man on the sidewalk was hit; Rochford ran to the man but saw he was dead. Perry and Rochford both identified the silver vehicle used in the shooting in video clips from the apartment building's surveillance cameras. Dozier also heard shots coming from a vehicle and saw the driver was an African-American woman, but he "did not get a good look."

¶ 15    Perry testified that he looked at the vehicle for two seconds and described the shooter as "dark skinned" with crimped or wavy hair. On cross-examination, Perry admitted he had been unable to identify defendant in a photo array, and though he later recognized her in a live lineup, he "wasn't sure." He agreed that defendant was pictured in the photo array with straight hair.

¶ 16    Rochford testified that the shooter was "light brown" and had "a ponytail with curls." After the shooting, Rochford viewed a photo array and identified the shooter as "either no. 1 or no. 2." Regarding his viewing of a live lineup, Rochford testified that "it was between No. 3 and No. 1." On cross-examination, Rochford said that defendant "must have had a wig on" in the vehicle, because she did not have curly hair when he next saw her.

¶ 17    Ellis testified that the day after the shooting, he was arrested in an unrelated matter and told police that he had information about Ireal's murder. On August 8, 2016, he was sitting on the porch of a home near the basketball court when he saw a "commotion" or "argument" between Ireal and

defendant. Afterward, defendant and a child headed toward defendant's home. Ten to twenty minutes later, defendant drove her silver Chevrolet Malibu down Polk Street two or three times with a man whom Ellis recognized from the neighborhood in the passenger seat. Then, as defendant drove eastbound on Polk toward Springfield, the driver's side window lowered and an arm holding a black object emerged from the window. Ellis lost sight of the vehicle but heard about six gunshots 5 to 10 seconds later. Afterward, he walked to the corner and saw Ireal's body. Police showed Ellis photo arrays in which he identified defendant as the woman on the basketball court and driving the silver Malibu, and identified Washington as the man in the passenger seat. Ellis identified defendant in court. On cross-examination, Ellis admitted that he agreed to testify to avoid additional prison time related to pending criminal charges.

¶ 18    During White's testimony, the court declared him a hostile witness. White denied having given the videotaped statement. When asked whether he made an identification in the photo array, he said, "I think I did, yeah, but [the detective] said it wasn't the right one."

¶ 19    Over defendant's objection, the trial court admitted into evidence certified records showing defendant owned a 2015 silver four-door Chevrolet Malibu LS.

¶ 20    Defendant called her cousin Sharmeaka Harris, who testified that on August 7, 2016, she went to dinner with defendant. They posed for a photograph, which was admitted into evidence. Around 9 p.m. the next night, August 8, Harris saw defendant at the house of Harris's aunt, who is defendant's mother, on North Springfield Avenue. Defendant had the same hairstyle as the previous night and did not appear upset. Harris said she had never seen defendant with curly hair or a wig and had never known defendant to have a firearm in her home.

¶ 21 Hagar Crosby, defendant's sister, also testified that she was at the dinner on August 7, 2016, and that she saw defendant at defendant's apartment around 8 p.m. on August 8.[3] When Hagar arrived at defendant's apartment, defendant was cooking and did not seem upset. Her hair was in the same straight hairstyle as the night before and was not in a ponytail; Hagar maintained defendant never wore her hair up or curled but always naturally straight. Hagar then drove the two of them to their mother's house. She testified that defendant did not own a firearm because "she's afraid." On cross-examination, Hagar confirmed that defendant drove a gray four-door Chevrolet. On redirect, Hagar said she and other friends of defendant—including Washington—sometimes borrowed the vehicle.

¶ 22 In rebuttal, the State called Tashyla Ellis.[4] Tashyla testified that in August 2016, she was living in the first-floor apartment on Polk Street with her family, including her brother Tavon Tanner, and was dating Travis Washington. Washington did not live in the apartment but would visit "[a]ll the time." Tashyla knew defendant and would sometimes do her hair, including crimping or curling. Defendant drove a silver Malibu and never let anyone else drive the vehicle outside her presence.

¶ 23 In closing, trial counsel argued defendant was misidentified, emphasizing that defendant's hairstyle differed from witness descriptions and suggesting that Washington and his girlfriend Tashyla may have been involved in the shooting.

¶ 24 The jury found defendant guilty of first degree murder.

---

[3] We refer to Hagar Crosby by her first name as she has the same last name as defendant.

[4] We refer to Tashyla Ellis by her first name, as she has the same last name as Mitchell Ellis, who is unrelated.

¶ 25    Before sentencing, a new attorney filed an appearance on behalf of defendant, and the court granted trial counsel's motion to withdraw.

¶ 26    In August 2020, posttrial counsel filed an amended motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial, alleging, in relevant part, ineffective assistance of trial counsel for failing to call Big Mike and Mike Mike as alibi witnesses. Attached to the motion were affidavits from Big Mike and Mike Mike, who averred that defendant was inside her apartment at the time of the shooting.

¶ 27    In December 2021, the trial court held an evidentiary hearing to address defendant's claim of ineffective assistance of counsel.[5] Defendant called two witnesses: Mike Mike and Big Mike.

¶ 28    Mike Mike testified that in August 2016 he was 13 years old and lived with Big Mike, defendant, and her children on Polk Street. On August 8, 2016, he was playing basketball when people on both teams began "trash talking," which escalated to "fighting words." Ireal slapped Mike Mike on the face. Mike Mike was upset and went to get Big Mike to confront Ireal. Because Big Mike was not there, Mike Mike told defendant what had happened. Defendant said, "Come on. We're about to go to the park," and they walked to the basketball court. Defendant asked Mike Mike who did it, and Mike Mike pointed to Ireal. Defendant asked Ireal, "Did you hit my son?" Ireal responded, "Yes." Defendant asked him to apologize, and Ireal refused. They talked for four or five minutes, then defendant and Mike Mike returned to the apartment. Defendant was "upset because her son had been hit" and went into the kitchen. Mike Mike could not see defendant, but

_____

[5] Prior to the hearing date, the Honorable Dennis J. Porter, who had overseen the trial, retired, and the Honorable Michael R. Clancy was assigned to the case.

he "assume[d] she stayed there because [he had] seen her in the kitchen." He confirmed that a door in the back of the kitchen led outside.

¶ 29    Mike Mike entered a bedroom, called Big Mike, and played on his phone. Big Mike arrived five to seven minutes later and Mike Mike told him what happened. Mike Mike then stayed in the bedroom until, some time later, Big Mike told everyone to leave the apartment. Mike Mike exited with Big Mike, defendant, and her children through the front door, and all seven of them left in Big Mike's vehicle. Though Mike Mike never heard gunshots, he saw police in the area when he was leaving. Big Mike dropped off Mike Mike at his mother's house and left with defendant and her children. Mike Mike never returned to the Polk Street apartment.

¶ 30    The next day, Mike Mike learned through social media that Ireal had been shot and killed. Later, he visited defendant in jail and spoke with her on the phone. At some point after the verdict, Mike Mike met with posttrial counsel and told him what he knew. He never spoke with trial counsel and was never asked to testify.

¶ 31    Big Mike testified that he was dating defendant in August 2016 and living at her apartment with Mike Mike. On August 8, 2016, Mike Mike called him sometime in the afternoon and told him someone had slapped him. Big Mike drove to defendant's apartment. Three or four people were outside the building, including Mike Mike, who was "hysterical." Big Mike then went inside to talk to defendant, who told him the incident "wasn't a big deal," and that she "went to [the] park to confront the guy and he apologized." Washington was also present and said he could show Big Mike where to find the person who slapped Mike Mike.

¶ 32    Big Mike went to his BMW, and Washington entered defendant's vehicle, which Washington "frequently borrowed." Big Mike drove behind Washington for about half a block,

then Washington "nodded" and they both pulled over. The person later identified as Ireal was there with another man. Big Mike exited his vehicle and asked Ireal if he had hit his son. Ireal responded, "it wasn't like that." Then, Big Mike hit him. Ireal's companion hit Big Mike and they "all got into a scuffle." Washington then approached the three "brandishing a gun" and Big Mike "rushed at him to stop him from shooting," but the others grabbed Big Mike and continued to fight. Police arrived, broke up the fight, and searched Big Mike. Washington had left the scene and did not interact with the police.

¶ 33    Big Mike walked back to defendant's apartment. When he reached the top of the stairs, he heard gunshots. He opened the door and defendant said, "Everybody out. Let's go," and they all ran downstairs to Big Mike's vehicle. They first dropped off Mike Mike at his mother's house, then went to defendant's mother's house and stayed there for the evening. He did not see defendant in her vehicle again and did not know what happened to it.

¶ 34    After defendant's arrest, Big Mike met with trial counsel approximately six times. Although Big Mike told the attorney the same information he recounted at the hearing, he was never asked to testify at trial. He was in the courtroom during the trial and saw defendant's sister and cousin testify.

¶ 35    On cross-examination, Big Mike admitted that he swore in his signed affidavit that when he heard the gunshots, he was outside of the building and saw a man running from a nearby corner. When asked about the discrepancy with his testimony, he said the person who prepared the affidavit told him "it was going to be loosely this and that and we'll get to it when you testify." When asked which version of events he wanted the court to believe, he said, "It's what happened.

*** They both are one [and] the same." Big Mike acknowledged serving prison sentences for multiple felonies.

¶ 36    The State called trial counsel, who testified that defendant retained him in December 2016 and he represented her through the October 2019 trial. He met with defendant's family multiple times, but he never met anyone introduced as Michael Mitchell Jr., Big Mike, or defendant's boyfriend. Trial counsel asked defendant's family for help locating Big Mike, but "nobody seemed to know where he was." Trial counsel knew of Mike Mike but never met him or made any effort to locate him.

¶ 37    Trial counsel testified that he met with defendant 5 to 10 times while she was incarcerated. They discussed trial strategy, but never an alibi defense, because defendant never told trial counsel that she was any place other than the scene of the murder. Rather, she told him that she was "in her car where the shots were fired from" with "[s]omebody named Big Mike." As a result, trial counsel's strategy was to show misidentification of defendant.

¶ 38    The trial court admitted into evidence certified copies of Big Mike's four felony convictions and stated it would consider them to the extent they affected his credibility.

¶ 39    Posttrial counsel argued that trial counsel's performance was deficient because he failed to locate Big Mike and Mike Mike and to call them as alibi witnesses. Although Mike Mike did not have defendant in view at the time of the shooting, his testimony would have been "relevant as to whether or not it was even possible for [defendant] to have left the house." Posttrial counsel asserted that "it is not up to this Court as to whether the Court believes the testimony or not"; rather, the only question was "whether or not that testimony was available."

¶ 40 Following the hearing, defendant filed a supplement to her motion for a new trial including two new affidavits from (1) her mother, Ruby Harris, stating she was present when Big Mike met with trial counsel on at least three occasions and (2) herself, stating she never told trial counsel she was in her vehicle during the shooting.

¶ 41 After reviewing the trial transcripts and considering the new alibi evidence, the trial court found trial counsel's performance did not fall below an objective standard of reasonableness and denied defendant's motion for a new trial. The trial court described inconsistencies in the testimony of Mike Mike, who said he told Big Mike about the incident while in the bedroom, and of Big Mike, who said the conversation happened outside. Big Mike's credibility was affected by his felony convictions and his "motive, interest, and bias in testifying as he did based on his prior intimate relationship with the defendant." On the other hand, trial counsel's testimony was "candid, straight forward, and believable." The court recounted that trial counsel testified that Big Mike was not present at his meetings with the family and the family did not provide assistance in locating him. The court also noted that defendant, as was her right, did not testify to an alibi at trial or at the hearing on the motion for a new trial to contradict trial counsel's account.

¶ 42 The court stated, "The thoroughness of [trial counsel's] defense was noted and was on display throughout the entire trial." It recounted trial counsel's cross-examination of witnesses, which highlighted the weaknesses of the State's case, and recalled that he called witnesses who testified that defendant had straight hair at the time of the murder and did not own a firearm. Although trial counsel "left no stone unturned," the evidence against defendant was "overwhelming," as defendant confronted the victim in daylight, in public, and in her neighborhood where many knew her. Shortly afterward, she shot the victim from her own easily

identifiable vehicle. As such, trial counsel's "outstanding lawyering simply was not enough." Furthermore, "[g]iven the account that [defendant] had provided to her attorney, the calling of a, quote, unquote, alibi witness *** would have amounted to [subornation] of perjury."

¶ 43 The trial court merged count II into count I and sentenced defendant to a total of 45 years' imprisonment: 30 years for the murder plus a 15-year firearm enhancement. The court denied defendant's motion to reconsider the sentence.

¶ 44 Defendant appeals, arguing that, because trial counsel was ineffective, the trial court erred when it denied her motion for judgment notwithstanding the verdict or, in the alternative, a new trial. She describes trial counsel's testimony as merely "a different version of events" and argues his representation was deficient because he did not attempt to find Mike Mike or do more to find Big Mike beyond asking defendant's family for help locating him.

¶ 45 Where, as here, a defendant raises a posttrial claim of ineffective assistance and the trial court reaches a determination on the merits, we will reverse only if the trial court's order was manifestly erroneous. See *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (applying manifest error on review of a *pro se* claim of ineffective assistance); see also *People v. Copeland*, 2022 IL App (1st) 210590-U, ¶ 49 (same, where defendant retained new counsel for ineffective assistance claim).[6] Manifest error is error that is clearly evident, plain, and indisputable. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004).

¶ 46 In reviewing a claim of ineffective assistance of counsel, we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which asks (1) whether trial counsel's

---

[6] "[A] nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes." Ill. S. Ct. R. 23(e) (eff. Feb. 1, 2023).

performance was deficient and (2) whether the deficiency prejudiced the defendant. See *People v. Albanese*, 104 Ill. 2d 504, 525-27 (1984) (adopting *Strickland*). A defendant must show that counsel's performance was "objectively unreasonable under prevailing professional norms" and that, but for the unreasonable performance, the result would have been different. *People v. Cherry*, 2016 IL 118728, ¶ 24. Failure to establish either prong precludes a finding of ineffective assistance. *Id*.

¶ 47     After reviewing the record, we find the trial court did not manifestly err in concluding that trial counsel's performance was not deficient. Stated differently, trial counsel's decision not to call Big Mike and Mike Mike as alibi witnesses was not objectively unreasonable.

¶ 48     First, there is a "strong presumption" that trial counsel's actions or inactions reflected sound trial strategy. *People v. Padilla*, 2021 IL App (1st) 171632, ¶ 137. Whether to call a witness is traditionally a strategic matter. *People v. Gavin*, 2021 IL App (1st) 182085, ¶ 38. To overcome the presumption of sound trial strategy, a defendant must show counsel's decision was so irrational that " 'no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy.' " *Id.* (quoting *People v. King*, 316 Ill. App. 3d 901, 916 (2000)). Here, defendant has not made such a showing.

¶ 49     At the hearing on defendant's motion, trial counsel explained that he met with defendant and discussed trial strategy with her, but never an alibi defense, because she never told him that she had an alibi. Rather, she told trial counsel that she was "in her car where the shots were fired from" with "[s]omebody named Big Mike." As a result, trial counsel's trial strategy was to try to show misidentification. Under the circumstances, this strategy was rational.

¶ 50    Further, as noted by the trial court, calling Big Mike and Mike Mike to testify as alibi witnesses would have amounted to subornation of perjury in light of defendant's disclosure that she was present in the vehicle during the shooting. A person commits perjury when, under oath or affirmation, he "makes a false statement, material to the issue or point in question, knowing the statement is false." 720 ILCS 5/32-2 (West 2016). Subornation of perjury—that is, knowingly procuring or inducing another to make a statement known to be false—is a Class 4 felony. 720 ILCS 5/32-3 (West 2016). The Illinois Rules of Professional Conduct further provide that a lawyer shall not offer evidence known to be false or knowingly assist a witness to testify falsely. Ill. R. Prof'l Conduct (2010) Rs. 3.3(a)(3), 3.4(b) (eff. Jan. 1, 2010).

¶ 51    Here, trial counsel provided a sound explanation for why he did not pursue an alibi defense. Had he argued defendant had an alibi with the knowledge that defendant was present at the shooting, he would have violated both Illinois law and the Rules of Professional Conduct. He instead reasonably pursued a misidentification defense, cross-examining the State's witnesses as well as presenting defense witnesses who contradicted the State's witnesses' descriptions of the shooter.

¶ 52    Second, the court considered Big Mike's affidavit and testimony at the hearing and found the evidence not credible. The court noted that Big Mike had four felony convictions. Also, his testimony was contradicted by trial counsel's and, in part, by Mike Mike's, and he had a "motive, interest, and bias" due to his relationship with defendant. See *People v. Lacy*, 407 Ill. App. 3d 442, 466-67 (2011) (trial counsel was not ineffective in failing to call the defendant's aunt because, in addition to being related to the defendant, the aunt's affidavit was inconsistent with other, indisputable evidence). The court also received the affidavits of defendant and her mother and

noted that defendant, as was her right, chose not to testify to contradict trial counsel's account. Meanwhile, the trial court credited trial counsel's testimony as "candid, straight forward, and believable," including his assertions that he never met with Big Mike, that he was unable to locate him, and that he did not pursue an alibi defense because defendant had told counsel she was with Big Mike in the vehicle when shots were fired.

¶ 53     Finally, Mike Mike's testimony, even if found credible, would not provide defendant an alibi. Mike Mike testified that he remained in the bedroom from the time he returned home with defendant until he left with Big Mike. He could not see defendant in the kitchen, where he "assumed" she remained during the shooting, and he confirmed that the kitchen had a door leading outside. Thus, had trial counsel located and interviewed Mike Mike, his testimony could not have exonerated defendant. See *People v. Williams*, 147 Ill. 2d 173, 245 (1991) (counsel's failure to interview witnesses may indicate incompetence if the witnesses are known to counsel and their testimony may be exonerating).

¶ 54     Under these circumstances, it was not manifest error for the trial court to find trial counsel's performance adequate.

¶ 55     In reaching this conclusion, we note that the three cases defendant cites in support of her claim that trial counsel's performance was deficient are inapposite. In each, the defendant filed a postconviction petition which met the lower bar of a "substantial showing" of ineffective assistance. See *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 36; *People v. Makiel*, 358 Ill. App. 3d 102, 109 (2005); *People v. Tate*, 305 Ill. App. 3d 607, 611-12 (1999). Defendant discusses no authority where, as here, the trial court held an evidentiary hearing on a defendant's claim, heard testimony and argument, and ruled on the merits.

¶ 56    For the reasons stated, the trial court did not err in finding trial counsel's performance was not deficient. As her claim fails this first prong of the *Strickland* test, we need not reach her arguments regarding prejudice. See *Cherry*, 2016 IL 118728, ¶ 24 (failure to establish either prong of *Strickland* test precludes finding of ineffective assistance). We thus affirm the trial court's order denying defendant's motion for judgment notwithstanding the verdict or, in the alternative, a new trial.

¶ 57    Affirmed.