2024 IL App (1st) 211664-U

SECOND DIVISION
March 5, 2024

No. 1-21-1664

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 55 |
| | ) | |
| RANDALL RUSH, | ) | Honorable |
| | ) | Brian Flaherty, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirmed. Trial court did not err in declining to appoint new counsel after preliminary *Krankel* inquiry, as allegations lacked merit or pertained solely to matters of trial strategy.

¶ 2    A jury convicted defendant Randall Rush of the first-degree murder of Sybil Parker. We affirmed his conviction on direct appeal but remanded the case to the trial court for a preliminary *Krankel* inquiry. *People v. Rush*, 2020 IL App (1st) 170237-U. Defendant now appeals the denial of his request to appoint new counsel, arguing that he showed possible neglect of his case by his trial attorneys, who allegedly failed to pursue three viable lines of defense. We agree with the trial court that defendant's ineffectiveness allegations all lack factual or legal merit, or, in some instances, pertain solely to matters of trial strategy. We thus affirm the trial court's ruling.

¶ 3                                   BACKGROUND

¶ 4                                 I. Trial evidence

¶ 5      The facts of Parker's murder and the trial proceedings are set forth in full detail in our decision on direct appeal. *Id.* ¶¶ 6-59. We recap only the facts that are relevant to the limited issues now before us.

¶ 6      On October 31, 2010, Parker was found dead on the floor of her bedroom in her two-story house in Hazel Crest. Parker lived with her son, Chasmand White; her niece, Shameka Ambrose; and Chasmand's dog, a pit bull named Black who was kept as a "guard dog" and was "aggressive towards people he doesn't know." Parker's daughter, Myesha White, lived with her fiancé, Alex Beard, in Thornton, but she frequently visited, and stayed overnight, at Parker's house.

¶ 7      Parker and defendant dated for several years. Defendant moved into Parker's house in February 2010. He moved out after their relationship ended sometime in October 2010, but he still kept some personal belongings there, including an entertainment center, in an upstairs bedroom that he used as an office.

¶ 8      Parker's house had three entry doors: one in the front and two in the rear. Only Parker used the front door or had a key to that door. The rear doors led, respectively, into the kitchen and the basement. Myesha, Chasmand, Parker, and defendant all had keys to the rear door leading into the kitchen. Other than Parker, everyone used that rear door to enter the house.

¶ 9      About a week before Parker's death, Myesha overheard a phone call between Parker and defendant. They were on speakerphone. According to Myesha, defendant told Parker "that if he found out [Parker] was giving her p---- to another man that he would kill her and him." Myesha also testified that defendant had a history of calling Parker repeatedly.

¶ 10    On the evening of October 30, 2010, Chasmand, Myesha, Myesha's daughter, and Parker ate pizza in Parker's bedroom on the second floor of the house. When Myesha and her daughter left, around 8 or 8:30 p.m., Parker was still in her bedroom with Black. Chasmand went to his bedroom in the basement and closed the door.

¶ 11    Around 9 or 9:30 p.m., Chasmand started watching a loud action movie on his "elaborate sound system." When Chasmand was in his bedroom, he generally could not hear anything on the second floor of the house. And when asked whether someone walking from the back door to the stairs leading up to the second floor would pass over his bedroom, Chasmand said no.

¶ 12    Chasmand fell asleep shortly after starting the movie. At some point—he was not sure when—he woke up to Black scratching at his bedroom door. This was unusual, because Black normally slept upstairs with Parker. He yelled at Black to stop and went back to sleep. He woke up the next morning at 11:00 a.m. and went up to the second floor to look for Black. He found the dog sitting at the foot of Parker's bed, with her dead body nearby.

¶ 13    Chasmand testified that he never left the door to the house open or unlocked, and that while Black would bark at strangers, he did not bark at defendant or otherwise show any aggression toward him.

¶ 14    Parker died of two gunshot wounds to her chest. The medical examiner testified that given the nature of the wounds, both gunshots were fired while Parker was laying on the floor, one with the gun in direct contact with Parker's skin, and the other at close range. Parker's body also had three stab wounds, one on each side of her chest and one on the right side of her back, and 21 incised or sharp-force injuries, mostly on her hands, wrists, and forearms. The incised wounds were superficial and appeared to be defensive. Parker's body also had abrasions on her face and upper and lower extremities.

¶ 15    At the time, defendant worked as a driver for Enterprise Transportation (Enterprise), a trucking company in Channahon, Illinois. His truck was equipped with a global positioning system (GPS) tracking device. The GPS records showed that on October 30, 2010, defendant's truck was at the Enterprise terminal, near Channahon, at 9:21 p.m. At 9:56 p.m., and again at 10:32 p.m., the truck was at a location a "couple blocks" from Parker's house. At 11:36 p.m., the truck was again near the Enterprise terminal. The distance between Channahon and Hazel Crest is approximately 30 miles.

¶ 16    Special Agent Joseph Raschke of the Federal Bureau of Investigation (FBI), an expert in historical cell site analysis, reviewed the call detail records for defendant's cell phone for the period between 8:30 p.m. on October 30, 2010, and 11:00 a.m. on October 31, 2010. In sum, the call detail records showed the following.

¶ 17    On October 30, 2010, between 8:38 p.m. and 9:49 p.m., defendant's phone made 15 outgoing calls to Parker's phone, each lasting only "a couple of seconds." As these calls were placed, defendant's phone moved progressively east from the Joliet area toward Hazel Crest. At 9:55 p.m. and 10:14 p.m., defendant's phone placed two more calls to Parker's phone, each lasting two seconds, and both utilizing the cell tower closest to Parker's house.

¶ 18    On October 31, 2010, at 1:48 a.m. and again at 9:16 a.m., defendant's phone made outgoing calls to Parker's phone, lasting four and five seconds, respectively, using a tower in the Joliet area.

¶ 19    Agent Raschke concluded that his analysis was "consistent with the phone having been in the Joliet, Illinois, area in the evening of October 30, 2010, travelling to the Hazel Crest area utilizing the tower and sector nearest [Parker's house] in Hazel Crest[,] and then travelling back to Joliet."

¶ 20     When processing Parker's house, the day after the murder, investigators found no signs of damage or forced entry on either the front or rear exterior doors. The gun used to shoot Parker was never recovered, but an empty Ruger gun box was found inside defendant's entertainment center, in the upstairs bedroom that he used as an office. A small pocket knife was found in Chasmand's bedroom in the basement. There was no evidence of blood on the knife and no usable prints on either the knife or the spent shell casings found in Parker's bedroom.

¶ 21     That same day, investigators searched defendant's truck at the Enterprise terminal. In the sleeper compartment, they found an empty gun holster and a key to the back door of Parker's house.

¶ 22     Video surveillance footage from Pilot Travel Center (Pilot) in Channahon showed defendant making a purchase around 5:30 p.m., on October 30, 2010. He was wearing blue jeans with a phone clip on the side, gym shoes, and a tan button-down, long-sleeved shirt.

¶ 23     The police searched the truck again, in fact twice, looking for the clothes that defendant was seen wearing in the security footage. The first time, they found what appeared to be the pants that he wore. A few days later, they found the shirt.

¶ 24     A blood stain on the shirt cuff contained a mixture of Parker's DNA and defendant's DNA. Parker's DNA was the major profile. Based on the amount of DNA present in that sample, the forensic biologist from the Illinois State Police believed that it had to come from bodily fluid, that is, from the blood itself, as opposed to "simple skin – cell-touch type DNA."

¶ 25     A small quantity of blood, containing a DNA profile from which defendant could not be excluded, was eventually found on the pants.

¶ 26     Both the left leg of the pants and the cuffs of the shirt contained very small quantities of gunshot residue. (The State's expert conceded that this amount of GSR, in theory, could have

been transferred to the items from a surface in the police station when they were photographed, provided that GSR particles were already present on the surface at that time.) Various areas of defendant's truck were examined for evidence of blood or GSR; none was found. When tested the day after the murder, neither defendant's nor Chasmand's hands had any traces of GSR.

¶ 27    Defendant was interviewed at the Hazel Crest Police Department. In sum, he stated that on October 30, 2010, he returned from Michigan after hauling a load for Enterprise. He refueled his truck at the Pilot in Channahon and went back to the Enterprise terminal, where he remained throughout the evening. He had not been to Parker's house in the previous two weeks and did not leave the Enterprise terminal at any time between October 30 and 31.

¶ 28    When he was confronted with the GPS records from his truck, which showed the truck was in Hazel Crest on October 30, he responded that the GPS tracking system was new, and that he did not believe it was functional at the time. The interviewing officers did not observe any cuts or bleeding on defendant's hands.

¶ 29    The State argued to the jury that defendant murdered Parker after flying into a "jealous rage" when Parker apparently refused to take his calls. The recent collapse of their relationship, the threatening phone call, his key to Parker's house, the GPS and cell-phone location data, the blood evidence, and more, the State contended, all added up to a strong circumstantial case, complete with ample motive and opportunity to commit the murder.

¶ 30    The defense argued a theory of reasonable doubt. Counsel attacked the forensic evidence, arguing that the DNA found on defendant's clothing easily could have been transferred, and that the real killer would have had far more blood on his clothes, not to mention injuries to his own hands, given the nature of the attack on Parker. Counsel further argued that Myesha's testimony about the threating phone call was uncorroborated and thus not believable, since Myesha was

biased. (As for why she was biased, all counsel could muster is that her mother had been killed.) Lastly, counsel argued that the police failed to conduct a meaningful investigation and rule out other potential suspects. For instance, counsel argued, the police failed to interview any witnesses from the neighborhood. And in this context, counsel tried to cast suspicion on Chasmand, who was in the house when Parker was murdered yet claimed to hear nothing.

¶ 31                                    II. Preliminary *Krankel* inquiry

¶ 32     On direct appeal, we remanded for a preliminary *Krankel* inquiry, finding that defendant raised a *pro se* claim of ineffective assistance when he told the trial court, during his allocution at sentencing, that there was "quite a bit" of favorable evidence that "should have been presented" at trial but was not. *Id.* ¶¶ 110-127.

¶ 33     By the time the trial court conducted the inquiry on remand, defendant's lead attorney had retired from the public defender's office. Co-counsel, who served as the "second chair" (in the trial court's description), appeared at the proceeding. The court did not ask co-counsel any substantive questions about the case. The court allowed defendant to speak freely, periodically encouraging him to allege any and every claim he thought he had, as long as it pertained to the representation he received. And there were many. But most of his claims have been abandoned on appeal. So we will focus on the three that remain at issue and leave the rest aside.

¶ 34     First, a "major key issue[ ] that was left out" of counsel's presentation "was the drug use around the house," specifically by Chasmand. When the police investigated Parker's murder, "[p]eople in the neighborhood said we believe there's drug activity going on in that house due to the amount of traffic we see back and forth." In the course of these dealings, Chasmand "got into it with some guys out in the street" and sustained a head injury that required three staples. When defendant asked Parker if it was "over with," she said she didn't know, and that "they might still

be after him." Thus, as defendant explained, "my whole thing was someone came there looking for [Chasmand], if [Parker] was there and things transpired."

¶ 35    Second, counsel failed to present evidence that Parker frequently wore defendant's shirts, which would have "easily explain[ed]" why her DNA was present on the cuff of the tan shirt that was found in his truck, and which the surveillance video showed him wearing on the evening of the murder.

¶ 36    Third, Myesha testified to defendant's alleged threat "that if he found out [Parker] was giving her p---- to another man that he would kill her and him." But all that defendant actually said to Parker on that phone call was, "I am a one-woman man," an innocent expression of his "loyalty." Or so he alleged.

¶ 37    Defendant claimed Myesha was biased toward him and resented him. Defendant knew this well, and so he gave counsel a list of questions designed to elicit her motivations to lie. But counsel failed to use them. In particular, counsel never asked Myesha how she felt about the amount of time that Parker spent with defendant. According to defendant, this left Myesha feeling "abandoned," and when she became pregnant, thus derailing her plans to attend nursing school, she blamed her mother's relationship with defendant for her circumstances.

¶ 38    Myesha's fiancé, Alex Beard, did not testify. Defendant alleged that while Alex initially claimed to hear the threatening phone call, "when the police were canvassing and asking questions," he later had a change of heart and "decided he wasn't going to go on there and tell that lie on me." At first, he may have been willing "to say whatever [Myesha] wants him to say," because they were engaged, but his change of heart led to a fight between them. They ultimately "broke up because he refused to come to this courtroom and say he heard me say that because I didn't say that." Counsel failed to introduce any of this evidence.

¶ 39    At the end of the proceeding, the trial court declined to appoint new counsel. The court summed up its general impression of defendant's allegations as follows: "I think what we are doing is—we are kind of doing you know what, I have been convicted. I got sentenced to jail on a murder case. I am going to pick through every little bit of things and basically say [counsel] should have done this, [counsel] should have done that." But defendant didn't "present[ ] any evidence" that supported a viable claim of ineffective assistance.

¶ 40    The trial court further found that it was counsel's prerogative to decide, as a matter of trial strategy, what questions to ask, or not ask, the witnesses. As for defendant's relationship with Parker and any resulting motivations that the witnesses may have had to lie, only defendant himself, through his own testimony, could have offered this evidence. But as was his right, defendant elected not to testify.

¶ 41    All in all, the trial court ruled, defendant "ha[s] not proved that [he] was not represented at all in this case."

¶ 42                          ANALYSIS

¶ 43    Defendant claims the trial court should have appointed new counsel to litigate his *pro se* claims of ineffective assistance because they show "possible neglect" of the case by trial counsel. See *People v. Ayres*, 2017 IL 120071, ¶ 11; *People v. Moore*, 207 Ill. 2d 68, 78 (2003). Specifically, he says, trial counsel failed to present evidence (1) that Chasmand was involved in "drug activity" in and around Parker's house; (2) that Parker wore defendant's shirts; and (3) that Myesha was biased against defendant.

¶ 44    A claim shows possible neglect if it has "some" merit—if is not "spurious," "frivolous," or "unfounded"—and if it does not pertain solely to matters of trial strategy. *People v. Roddis*, 2020 IL 124352, ¶ 35, 56, 67; *People v. Jackson*, 2020 IL 124112, ¶ 97, 106; *Moore*, 207 Ill. 2d

at 78. This threshold determination is based on both the factual and legal merits of the claim. *Roddis*, 2020 IL 124352, ¶¶ 61, 70.

¶ 45    Thus, "[a] claim lacks merit if it is conclusory, misleading, or legally immaterial or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel." *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 40. Put differently, while the defendant does not need to establish that trial counsel was ineffective at this juncture, he must show that trial counsel was *arguably* ineffective—arguably deficient, to some arguably prejudicial effect—and hence that there is a reason to appoint new counsel to investigate and litigate any such arguable claim(s) on his behalf.

¶ 46    To determine whether the claim(s) raised at a preliminary *Krankel* inquiry demonstrate possible neglect, "some interchange between the trial court and defendant's trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary." *Jackson*, 2020 IL 124112, ¶ 110.

¶ 47    But there is no hard-and-fast rule that the trial court must inquire of defense counsel. A "discussion between the trial court and the defendant may be sufficient" to resolve the claims, and the trial court can also rely on its own knowledge of counsel's performance at trial, as well as any insufficiencies on the face of the allegations themselves. *Moore*, 207 Ill. 2d at 78; see also *People v. Chapman*, 194 Ill. 2d 186, 230-31 (2000) (discussion with defendant sufficient to find, without inquiring of counsel, that claims either related to trial strategy or lacked merit); *People v. McCarter*, 385 Ill. App. 3d 919, 940-41 (2008) (same).

¶ 48    We review the trial court's ruling after a preliminary *Krankel* inquiry for manifest error. *Jackson*, 2020 IL 124112, ¶ 98. But here, defendant argues, our review should be *de novo*, since the ruling below was "frustrated by an erroneous application of the law." Our supreme court has

historically applied this principle when an exercise of discretion by the trial court—typically, but not always, in admitting evidence—was predicated on an underlying legal error. See, *e.g.*, *People v. Williams*, 188 Ill. 2d 365, 369 (1999); *People v. Brockman*, 143 Ill. 2d 351, 363 (1991).

¶ 49    That is not quite what defendant alleges here. At the end of the *Krankel* proceeding, the trial court announced its ruling as follows: "You haven't presented any evidence to me anything that [trial counsel] has done. So your motion under *Krankel* is denied. I find you have not proved that the defendant was not represented at all in this case."

¶ 50    In his reply brief, defendant asserts that this was no mere verbal slip-up, but rather proof that the trial court held him to the wrong legal standard. In defendant's view, the trial court said, and meant, that he failed to prove that his trial attorneys did "anything" at all to represent him— and *that* is why his claims failed. So the trial court, in his view, didn't merely err by holding him to the *Strickland* standard that applies after a full *Krankel* hearing with appointed counsel; even worse, the trial court held him to the *Cronic* standard, where counsel's representation must be so deficient as to constitute no representation at all, a total breakdown of the adversarial process in which prejudice to the defendant is presumed. See *United States v. Cronic*, 466 U.S. 648, 661-62 (1984).

¶ 51    This one remark, on its own, does not convince us that the trial court held defendant to the exceedingly demanding and rarely-invoked *Cronic* standard. It seems far more likely, in our view, that the trial court's ruling was simply couched in errant verbiage—a predictable enough consequence of speaking off the cuff—and did not reflect the wholesale legal confusion that defendant claims to discern.

¶ 52    Defendant does not cite any case that applies *de novo* review, in place of the manifest-error review generally mandated by our supreme court's precedents, based solely on the errant

language used by the trial court in pronouncing its ruling after a preliminary *Krankel* inquiry. (Such errant language is common enough, as a Westlaw search easily confirms.) And *de novo* review would not change our disposition of this case, anyway. So if there is anything more to be said about this topic, it is best left for another day. We turn to the merits of defendant's claims.

¶ 53    We begin with the purported evidence of Chasmand's "drug activity" in and around the house. As defendant described this evidence, some neighbors told the police that they "believed" there was drug activity afoot, given the amount of "traffic" in and out of Parker's house. That's a rather thin basis for concluding that Chasmand was either using or dealing drugs, but at the least, the neighbors could have testified to their observations about the number of people going in and out of the house. Chasmand's drug use was serious enough to warrant a family "intervention," and he recently "got into it" with some guys "out in the street," ostensibly because of his drug use. (Or dealing? It's unclear from defendant's allegations.) For all Parker could tell defendant— which wasn't much—these guys "might still be after" Chasmand. All of which suggested, to defendant's mind, that Parker was murdered by one of these drug-involved individuals who entered the house looking for Chasmand but ran into Parker instead.

¶ 54    As defendant presented his claim below, the alleged deficiency in the representation was counsel's failure to produce this evidence at trial and "educate" the jury about Chasmand's drug activities. In his own words: Chasmand's drug use was "a major issue which also wasn't pointed outed [*sic*] by [counsel] to the jury." Later, he reiterated: "One of the major key issues that was left out, one of the things that I was upset about, was the drug use around the house." Again: "[Counsel] didn't bring it up to the jury," this time referring to the neighbors' beliefs that there was drug activity in Parker's house.

¶ 55    To put a somewhat finer point on the *pro se* allegations: counsel should have argued a

theory of defense (Parker might have been murdered by whoever was "after" Chasmand) and supported the theory with known evidence (Chasmand's "drug activity"). But instead, counsel pointed the finger at Chasmand himself, intimating that *he* might have killed Parker, given that he was in the house and claimed, implausibly in the defense's view, to sleep for 14 hours while his mother was murdered upstairs.

¶ 56    Defendant thus alleged, in *pro se* fashion, that within the defense's general framework of reasonable doubt, counsel should have offered a different hypothesis, or perhaps two hypotheses in the alternative, about who the real killer might have been. The choice of defense theories is, in general, a strategic calculation, to be made by counsel after a diligent investigation. See, *e.g.*, *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 39.

¶ 57    A key point of the *Krankel* procedure is to generate a record of counsel's *reasons* for trying the case in a particular way, so that we can determine whether the defense presented was the result of an actual, reasonable, and informed strategic decision, or the result of incompetence or literal neglect, often in the form of a failure to investigate and thus develop a potential line of defense. The alternative to generating a record of this kind is to speculate, as we inevitably must do on direct appeal, about the strategic decisions that a hypothetical reasonable attorney could have made. See *People v. McCall*, 2022 IL App (1st) 172105, ¶¶ 201-208 (Ellis, J., concurring in part). Unfortunately, the purposes of the *Krankel* procedure were not fully served here, because the trial court left counsel standing mute at the proceeding.

¶ 58    But whatever counsel's reasons for leaving Chasmand's drug use out of it, we can confidently say that defendant's theory doesn't fit with the trial evidence, and that the evidence, taken "as a whole," was overwhelming, even if no one piece was decisive on its own, because it points to defendant's guilt from myriad directions. *Rush*, 2020 IL App (1st) 170237-U, ¶ 76.

¶ 59    To recap the case against defendant: His relationship with Parker had recently fallen apart, and he reportedly threatened to kill her if he found out that she was with another man. On the night of the murder, defendant called Parker *incessantly*—17 times, to be exact—with each call lasting only seconds, indicating that Parker was not taking his calls. Myesha testified to other examples of defendant repeatedly calling Parker in similar fashion. While calling, he drove his truck 30 miles from the terminal in Joliet to Hazel Crest. He lied about this to the police.

¶ 60    He parked a couple of blocks from Parker's house, and the final two calls pinged off the cell tower closest to her house. He had a key to Parker's house—which showed no evidence of forced entry—and peaceful relations with the "aggressive" pit bull who resided there as a guard dog. Parker's blood was on the shirt he wore that night. There was blood, consistent with his own DNA, though the results were not conclusive, on his pants. Both items of clothing had small but still detectable amounts of gunshot residue. The gun was never found, but defendant's gun box was upstairs in Parker's house, in the room next to one in which her dead body was found; and his holster was in the sleeper compartment of his truck.

¶ 61    All of this evidence points, from multiple directions, to defendant as the killer. His theory does nothing to explain this evidence, or its apparent implication of guilt, apart from positing one unaccountable coincidence after another: Parker bled on the shirt he just happened to wear that night (without cleaning the bloodstain); there was blood on the pants he just happened to wear; both items of clothing just happened to get contaminated with gunshot residue while sitting on a police officer's desk; either defendant just happened to drive 30 miles out of his way, parking in the immediate vicinity of Parker's house, for independent reasons; or, more in line with what he told the police, the GPS was not functioning properly and just happened to place him there— while the cell-site data just happened to trace out the identical trajectory from Joliet to Parker's

immediate neighborhood. And so on.

¶ 62     Defendant's theory runs headlong into one other fact that bears special mention. As we have noted, there was no evidence of forced entry into Parker's house, which strongly suggests that the murderer had access. *Id.* ¶ 88. The trial evidence showed that the exterior doors were kept locked, which is hardly surprising in a household that also kept a pit bull as a guard dog. Defendant, as we noted, had a key. Surely a drug-involved individual from the neighborhood who was "after" Chasmand did not.

¶ 63     In an effort to reconcile defendant's theory with this evidence, appellate counsel posits that Chasmand may have left the door unlocked that night, contrary to his trial testimony, thus allowing whoever was "after" him to walk right into the house and murder Parker. And what is the basis for this? Just the alleged fact that Chasmand used drugs. Even if he did, it is sheer speculation to say that he thus left the door unlocked when he testified otherwise. And recall that, after family ate pizza in Parker's bedroom, Chasmand retired to his own bedroom to watch a movie while Myesha, who also had a key to the house, left with her daughter. That makes Chasmand's drug use even less of an explanation for how the door may have been uncharacteristically left unlocked on that fateful night. (To add that perhaps Myesha forgot to lock the door on her way out would just pile on more speculation.) And for what it's worth, the doors were locked when the police arrived the next day. So if Chasmand lacked the presence of mind to lock the door at night, he must have regained it after finding his mother's dead body.

¶ 64     We don't mean to get too deep into the weeds here. The point is simply that defendant's theory requires one to sweep aside evidence that points to his guilt from numerous directions and replace that evidence with speculation that whoever was "after" Chasmand got into the house, despite the precautions routinely taken; killed Parker; and left the *intended* victim right there in

his bed, asleep and defenseless. And the entire edifice of this theory is built on nothing more than the alleged fact that Chasmand used drugs and had recently been in some sort of fisticuffs with someone or other.

¶ 65    There is absolutely no reason to suppose that defendant's theory would have fared any better than trial counsel's theory that Chasmand might have killed Parker. There is far too much evidence pointing right at defendant that neither theory can even begin to explain.

¶ 66    Defendant cannot make even an arguable or "colorable" showing (*McLaurin*, 2012 IL App (1st) 102943, ¶ 40) that evidence of Chasmand's drug use would have had a significant impact on the case, or that the theory he proposes would have given him a fighting chance to prevail at trial. In other words, he was not even arguably prejudiced by the omission of this issue from his overall defense.

¶ 67    Appellate counsel would have us read defendant's allegations more broadly, to include not only a claim that trial counsel "didn't bring [Chasmand's drug use] up to the jury," but also that counsel failed to conduct a reasonable investigation into this possible defense, in particular, by failing to interview known witnesses whose testimony could have exonerated defendant. See *Strickland v. Washington*, 466 U.S. 668, 691 (1984) (trial counsel "has a duty to make reasonable investigations or reasonable decisions that make particular investigations unnecessary"); *People v. Domogala*, 2013 IL 113668, ¶ 38; *Upshaw*, 2017 IL App (1st) 151405, ¶ 39.

¶ 68    A failure to *investigate* a possible defense is different than a failure to *present* a defense at trial. See *Upshaw*, 2017 IL App (1st) 151405, ¶ 39; *People v. Wilborn*, 2011 IL App (1st) 092802, ¶¶ 96-97. The parties dispute whether defendant said enough to allege a failure to investigate, or whether this claim was forfeited. As we read the record, defendant did not exactly allege that counsel failed to investigate this issue, but then again, that is not an implausible

understanding of his *pro se* allegations, if they liberally construed, as we think they should be. See *People v. James*, 2017 IL App (1st) 143391, ¶ 148 (liberally construing *Krankel* allegations). But we will not rest our decision on the question of forfeiture, in part for the following reason.

¶ 69 If the trial court had simply asked counsel what steps were taken with respect to this issue, we would know what investigation, if any, was conducted, and if none was conducted, on what basis counsel concluded that it was not necessary to pursue the issue any further. Having counsel make a record is often the best way to cut through any arguable ambiguity in the *pro se* allegations, to know for certain whether we are assessing an informed strategic decision or a failure to investigate a potential defense, and thus to further limit and define the potential issues on appeal. See *People v. Patrick*, 2011 IL 111666, ¶ 41. Any lingering unclarity in this respect is due, in some measure, to the failure of the preliminary *Krankel* proceeding to fully serve its purposes. Because that is not our *pro se* defendant's fault, we are reluctant to charge him with forfeiture.

¶ 70 That said, appellate counsel's expansive interpretation runs into the same problems that we have already identified with defendant's theory. Roughly speaking, the ineffectiveness claim is this: People in the neighborhood, including Chasmand, use (and sell?) drugs. Chasmand got into some fisticuffs "out in the street," and the fight had something to do with drugs. Investigate this drug activity, find whoever squared off with Chasmand, and maybe—just maybe—you will find the person who murdered Parker.

¶ 71 Thus embellished by appellate counsel, the theory still grasps at straws. To be clear, at the preliminary stage of a *Krankel* proceeding, a *pro se* defendant need not specifically identify a well-developed suspect whom counsel failed to interview. The standard, at this stage, must be significantly lower than that. But even at the preliminary stage, an allegation that more

- 17 -

investigation into this or that "could have potentially led to an alternate suspect" must be based on something more than tenuous speculation. *Cf. People v. Pecoraro*, 175 Ill. 2d 294, 324 (1997) ("counsel is not necessarily required to investigate every individual with a conceivable motive to kill the victim").

¶ 72    An "alternate suspect" worth the name is someone who plausibly could have committed the crime, considering its circumstances and all other available evidence. For the reasons we have given, the circumstances and evidence point to defendant from numerous directions. It is all but impossible to see how the hypothetical "alternative suspect" that figures in this theory could ever be reconciled with the evidence at trial. If there was *some* explanation of how this theory could cast at least *some* of the critical evidence in a new light, that would be reason enough to appoint post-trial counsel to litigate the claim. But notwithstanding appellate counsel's valiant efforts, we remain hard-pressed to describe this claim as anything more than a non-starter.

¶ 73    Next, defendant argues that trial counsel failed to present evidence that Parker frequently wore his shirts. In defendant's view, this evidence would have provided an alternative, innocent explanation for how Parker's DNA was found on the cuff of the tan shirt that he was seen (in the travel center security video) wearing on the evening of the murder.

¶ 74    This claim lacks factual merit. Like Chasmand's purported drug use, the fact the Parker wore defendant's shirts establishes nothing of consequence. The DNA in question was found in a blood stain on the cuff of defendant's shirt. The stain contained a mixture of DNA from Parker and defendant. Parker's DNA was the major profile. Regarding the major profile, the forensic scientist testified as follows: "The amount of DNA that was present I would most likely expect from a bodily fluid rather than simple skin – cell-touch type DNA." In other words, in the forensic scientist's (admittedly fallible) opinion, Parker's DNA was deposited on the shirt from

her blood, not from the shirt touching her skin. Or, more simply put, it wasn't just Parker's DNA on the shirt; it was her blood.

¶ 75    Because the absolute amount of DNA present was still small, and because DNA can, in principle, be transferred from a person to an object, where it can linger for quite some time, trial counsel argued to the jury that Parker's DNA could have been transferred to defendant's shirt through what we might call incidental contact between Parker and the shirt, while defendant was wearing it in her presence.

¶ 76    In appellate counsel's view, it would have been better to argue that Parker's DNA could have been deposited on the shirt when *she* was wearing it. The forensic scientist's testimony, appellate counsel says, did not rule out this possibility: without any evidence that Parker wore the shirt herself, the forensic scientist's testimony that the major profile most likely did not come from "simple skin – cell-touch type DNA" could only mean that it did not come from incidental contact while defendant wore the shirt. But it *might* have come from Parker while *she* wore the shirt. And trial counsel *might* have been able to establish as much through the forensic scientist's testimony, if counsel had presented evidence that Parker actually wore defendant's shirts.

¶ 77    Appellate counsel pins this distinction on the word "simple" in the phrase "*simple* skin – cell-touch type DNA." That is, "simple" means something like: through incidental contact between Parker and the shirt while defendant wore it. So contact between Parker and the shirt, while Parker wore it herself, would evidently be something other than "simple." This distinction has no apparent basis and is entirely of appellate counsel's invention.

¶ 78    Suppose that defendant wore the shirt around Parker and embraced her, thus resulting in the deposit of her DNA on the cuff. Or suppose, instead, that Parker wore the shirt herself and deposited her DNA on it. In either scenario, the DNA is deposited by means of contact between

the shirt and Parker's skin cells. And the forensic scientist testified that he would not expect the major DNA profile to have come from contact between the shirt and skin cells; in all likelihood, it came from the blood stain in which it was found. Again, Parker's blood, and not just her DNA, was on the cuff of the tan shirt.

¶ 79    Thus, what defendant really needed was evidence that provided an innocent explanation for how Parker's *blood* wound up on the shirt that defendant was seen wearing on the evening of the murder. The mere fact that she wore his shirts from time to time, because they smelled of his aftershave, fails to provide the needed explanation. Of course it is *possible* that Parker recently wore *and bled* on the tan shirt, but without direct evidence that this actually happened—evidence that defendant did not claim to have—that is just more speculation.

¶ 80    And to make anything of this fact, the jury would once again have to accept a remarkable string of coincidences: Parker had already bled on the shirt that defendant just happened to wear (while still bloody) on the night of the murder; there just happened to be blood on defendant's pants; both articles of clothing just happened to pick up gunshot residue in the police station; defendant just happened to be in the immediate vicinity of Parker's house, having been calling her incessantly; and so on.

¶ 81    In short, because it was Parker's blood, and not just her DNA, on the tan shirt, the mere fact that Parker wore defendant's shirts explains little or nothing. This evidence would not have established anything of consequence for the defense.

¶ 82    Lastly, Myesha testified to defendant's alleged threat "that if he found out [Parker] was giving her p---- to another man that he would kill her and him." The State used this testimony to establish defendant's motive to kill Parker. Defendant claims that Myesha's testimony was a lie and the product of her bias against him. He thus alleges that trial counsel failed to elicit evidence

of her bias.

¶ 83    Let's take a closer look at defendant's allegations below. They fall under two headings, the first being Myesha's feelings about her mother's relationship with defendant.

¶ 84    Defendant claimed that Myesha felt abandoned by Parker, on account of the time she spent with defendant, and even blamed her pregnancy and resulting inability to attend nursing school on that relationship. Defendant laid this all out, in the form of specific questions that trial counsel was to ask Myesha. According to defendant, counsel "started off *** on track," eliciting from Myesha that Parker spent a lot of time with defendant at his apartment in the city. But after Myesha started crying, counsel failed to follow through on the plan and ask "[t]he question he was supposed to ask"—namely, "how did that make you feel?" (We note, for what it's worth, that the trial record does not indicate that Myesha started crying at this point in her testimony.)

¶ 85    Defendant also told the trial court that counsel "actually spoke to" Myesha and "tried to convince her to give him the information," though precisely what "information" he was referring to in that comment is unclear to us. In any event, counsel reported to defendant that Myesha was "hostile." Defendant's own reaction was that counsel acted improperly by speaking to a member of the victim's family, and so he filed a complaint with the ARDC, alleging that his attorney was trying "to find out information that would be detrimental to [him]."

¶ 86    Defendant's own allegations, together with the trial record, establish this much: having conferred with his client, trial counsel was aware of the testimony that defendant wanted counsel to elicit at trial. Counsel spoke to Myesha. (Ironically enough, to his client's dismay.) Counsel argued that she was biased, though admittedly there wasn't much concrete evidence to base that on. In fact, her testimony suggested that she may not have felt so abandoned by Parker after all: for example, she "always spent nights" and weekends at Parker's house, so her mother could

watch her two-year-old for her while she worked. Counsel further attacked Myesha's account of the threatening phone call by arguing that it was uncorroborated.

¶ 87   Thus, although the trial court did not inquire of counsel at the *Krankel* proceeding, it is clear enough from the allegations and trial record that counsel made a strategic decision about how to present the issue of Myesha's bias to the jury after diligently meeting with both his client and the (hostile, uncooperative) witness in question. Again, we don't know what counsel's exact reasoning was—and after a preliminary *Krankel* hearing, we really should. But we know enough to say that counsel did not neglect the case in this regard.

¶ 88   Rather, defendant is claiming a right to dictate the precise questions that counsel poses to a witness on cross-examination. It is counsel's prerogative, not defendant's, to determine "[t]he manner in which to cross-examine a particular witness." *Pecoraro*, 175 Ill. 2d at 326-27; *People v. Gavin*, 2021 IL App (1st) 182085, ¶ 38. This allegation does not arguably support a claim of ineffective assistance, for exactly the reason that the trial court noted below.

¶ 89   The second category, speaking broadly for the moment, is the alleged conflict between Myesha and her (former) fiancé, Alex Beard, regarding Alex's refusal to testify that he heard the threatening phone call.

¶ 90   Defendant alleged that Alex initially claimed to hear the threatening phone call "when the police were canvassing and asking questions." But that was only because Alex was willing, for a time, anyway, to "say whatever [Myesha] wants him to say." Alex later changed his mind and "decided he wasn't going to go on there and tell that lie on me." This led to a physical altercation between Myesha and Alex, which resulted in their breakup, and in the misdemeanor domestic battery charge that the State fronted during Myesha's direct examination. (The jury was not told anything about the basis for the charge.) Myesha testified that the charge was "dismissed."

¶ 91    As appellate counsel glosses these allegations, Myesha tried to physically "coerce false testimony" from Alex. We find this description overstated. The scant record we have does not indicate, and defendant himself did not even allege, that Myesha literally tried to beat perjured testimony out of her fiancé. Taking defendant's allegations at face value, we can say two things: when Alex initially told the police that he heard the threatening phone call, he was lying and saying what (he believed) Myesha wanted him to say; and when he later refused to testify, an ostensibly heated argument erupted between them.

¶ 92    Granted, if Myesha knowingly pressured Alex into providing false evidence against defendant, through whatever means, that would speak to her bias and credibility. So we can put appellate counsel's overstatement to one side. Still, to substantiate this theory of Myesha's bias, the defense would need to introduce Alex's statement to the police, which was not in evidence; the reason(s) why Alex made that statement, despite knowing that it wasn't true; a disavowal of that statement; and an explanation for the disavowal, on the grounds of veracity and Alex's newfound scruples. In short, the defense would need to call Alex as a witness.

¶ 93    Absent an allegation that counsel failed to undertake a diligent investigation, a decision not to call a known witness is a matter of trial strategy. *Chapman*, 194 Ill. 2d at 230-31 (*Krankel* allegation that counsel failed to call alibi witness was trial strategy and properly dismissed after preliminary inquiry even without asking counsel to explain the reasons for that decision).

¶ 94    And this strategy for discrediting Myesha would inevitably come at a high price for the defense. To reiterate, this theory of Myesha's bias, according to own defendant's allegations, is borne out by the giving and retracting of Alex's statement, to the police, that he heard defendant make the threat that Myesha attributed to him. By its own hand, the defense would thus offer the one piece of evidence—Alex's statement to the police—that could corroborate Myesha's

otherwise *un*corroborated account of the threatening phone call. (A point that counsel relied on in closing argument to argue that her account deserved little weight.)

¶ 95    So the claim of ineffectiveness, in a nutshell, is that counsel should have called Alex, even if his statement to the police corroborated Myesha's testimony; elicited from Alex a recantation of his statement and an explanation of its genesis; and urged the jury to see Alex's recantation as a reason to discredit Myesha—on the ground that Myesha, not Alex, was to blame for Alex's false statement to the police. Spelling out the theory thus suffices to show that the ineffectiveness allegations lack merit on their face.

¶ 96    The weakness of defendant's allegations and the strength of the overall evidence against him combine to make this case an exception to the general rule that some exchange between the trial court and counsel is generally required to resolve the claims raised at a preliminary *Krankel* inquiry. See *Jackson*, 2020 IL 124112, ¶ 110. We would caution trial courts not to read our decision today as a license to generally leave counsel standing mute. It is all too easy to imagine a case in which the lack of a fully developed record, of the kind that *Krankel* was designed to generate, will leave a reviewing court with no choice but to find that the allegations, taken at face value, show possible or arguable neglect. With that word of caution, we agree that the allegations here did not require the appointment of new post-trial counsel.

¶ 97                                    CONCLUSION

¶ 98    The judgment of the circuit court is affirmed.

¶ 99    Affirmed.